## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| WILLIAM DeFORTE, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:16-cv-113 |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | |
| COLONEL TYREE C. BLOCKER, | ) | |
| Acting Commissioner of the Pennsylvania | ) | |
| State Police; CORPORAL JOSEPH R. | ) | |
| ZANDARSKI (individually and as an | ) | |
| Officer in the Pennsylvania State Police), | ) | |
| jointly and severally, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION

**Mark R. Hornak, United States District Judge**

In this civil action, Plaintiff William DeForte ("DeForte") has sued Corporal Joseph R. Zandarski ("Zandarski"), a trooper with the Pennsylvania State Police, for the alleged violation of his rights under federal and state law.[1] This Court's subject matter jurisdiction is premised on 28 U.S.C. §1331 and §1367.

Presently pending before the Court is Zandarski's motion to dismiss the Complaint (ECF No. 7). For the reasons that follow, Zandarski's motion will be granted in part and denied in part.

---

[1] DeForte originally named Colonel Tyree C. Blocker, Acting Commissioner of the Pennsylvania State Police, as an additional defendant. However, the claims against Colonel Blocker have since been dismissed.

# I.    BACKGROUND[2]

On July 23, 2009, DeForte was hired as a police officer for Worthington Borough, Pennsylvania. (Compl. ¶8, ECF No. 1.) He was promoted to the position of Assistant Chief of Police on or around September 8, 2009 and made Chief of Police on March 9, 2010. (*Id.* ¶¶ 9-10.)

During the course of his tenure with the Borough, DeForte often "clashed" with fellow police officer Gerald Rodgers, Borough Mayor Kevin Feeney, and Borough Councilman and Constable Barry Rosen. (Compl. ¶¶16, 21.) For example, DeForte opposed Feeney's and Rosen's practice of instructing officers that they had to cover the costs of their salaries and police vehicles by writing tickets and collecting fines. (*Id.* ¶¶18-19.) In addition, DeForte opened an investigation at one point into Feeney's suspected involvement in the theft of radios that were located in the Borough's fire hall. (*Id.* ¶17.) On another occasion, DeForte confronted Rosen about what DeForte believed was an unlawful use on Rosen's part of his unmarked police vehicle to effectuate traffic stops and conduct police business. (*Id.* ¶¶21-24.) DeForte also became aware that Officer Rodgers had operated a logging truck in connection with his logging business on roads in another township that he was not bonded to use. (*Id.* ¶¶25-28, 30.)

On September 20, 2011, Feeney signed documentation guaranteeing that any money or equipment donated to the Worthington Borough Police Department by the officers could be retained by the officers as their personal property. (Compl. ¶56.) In reliance on the terms of this document, DeForte and another fellow officer brought furniture, pictures, a television, and various other items to the police department. (*Id.* ¶57.) They also personally funded the acquisition of five (5) Sig Sauer 556 rifles and a handgun, along with sundry personal effects.

---

[2] The following background facts are derived from the Complaint (ECF No. 1). For present purposes, we accept all well-pled averments in the Complaint, and all reasonable inferences arising therefrom, as true. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 210-11 (3d Cir. 2009).

2

(*Id.*) Feeney later permitted DeForte to exchange one of the Sig Sauer 556 rifles for a rifle of his liking through a firearms dealer. (*Id.* ¶87.) Feeney further authorized DeForte to put the new rifle in his own (DeForte's) name. (*Id.* ¶88.)

During times relevant to this litigation, DeForte used an AR-15 style rifle for training that was mostly built with parts that DeForte personally owned. (Compl. ¶31.) Specifically, the upper assembly of the rifle was purchased and owned by DeForte, while the lower assembly of the rifle was owned by the Worthington Borough Police Department and had been purchased with police equipment grant funds. (*Id.* ¶¶31-33.) In May of 2012, Officer Rodgers expressed interest in trading another rifle for the AR-style rifle that DeForte had been using (hereafter, "Rifle A"). (*Id.* ¶58-59.) DeForte informed Rodgers that he (Deforte) would need to receive permission from Feeney to transfer the lower assembly of Rifle A, as it was owned by the Worthington Borough Police Department. (*Id.* ¶61.)

A few days later, DeForte spoke with Feeney about the matter. Feeney remarked that Rodgers was a "top producer" in terms of issuing citations and tickets, and he ordered DeForte to transfer the lower assembly of Rifle A to Rodgers in order to keep Rodgers happy. (Compl. ¶¶62-66.) On May 31, 2012, in the presence of DeForte and another Borough officer, Feeney signed paperwork approving the transfer of the lower assembly of Rifle A to Rodgers. (*Id.* ¶¶72-73.) Deforte agreed to transfer the rifle to Rodgers in reliance on this documentation authorizing the transfer. (*Id.* ¶80.)

In the summer of 2012, DeForte discovered that Feeney had used thousands of dollars of police grant money to fund the repair and replacement of the traffic control light system on U.S. Route 422. (Compl. ¶¶92-95.) This prompted DeForte to open an investigation into the misuse of the police grant money. (*Id.* ¶96.)

3

Later that summer, the Borough's police department initiated an undercover prostitution sting operation based on information that internet call girls were using rendezvous points within the Borough to engage in illegal sexual transactions. (Compl. ¶97.) According to DeForte, the Pennsylvania State Police ("PSP") became "extremely annoyed" with him and advised him that he had to inform PSP of all activity involving prostitution work. (*Id.* ¶¶98-99.) DeForte informed PSP that he was not under any obligation to inform them about the Worthington prostitution sting. (*Id.* ¶100.) PSP then provided an explanation for their position which DeForte found "ridiculous." (Id. ¶¶101-104.) Shortly after PSP became aware of the prostitution sting operation, Worthington Borough started to have problems negotiating with PSP concerning a new highway agreement. (*Id.* ¶105.)

The sting operation resulted in several arrests. (Compl. ¶106.) The money confiscated from each arrest was placed into an individual evidence envelope, logged according to the arrest record, and placed in the Borough police department's evidence locker. (*Id.* ¶¶117, 120.) Once the case was disposed of in court, the envelope was no longer evidence and was transferred to the gun safe until it could be recovered through the courts or returned. (*Id.* ¶118.)

During the course of the sting operation, the PSP barracks commander contacted DeForte about an individual who worked for the commander's brother and who had been identified during the course of the sting operation but never charged. (Compl. ¶¶107-112.) The PSP commander informed DeForte that he and his brother did not like the individual in question and wanted him criminally charged. (*Id.* ¶¶110-111.) DeForte advised the PSP commander that the individual had not engaged in any criminal behavior and DeForte would not file false charges against him. (*Id.* ¶¶ 107-108, 112.) Because he "was not comfortable with the direction that the phone call was going in," DeForte terminated the call. (*Id.* ¶113.) Within a few days thereafter,

4

members of the media contacted DeForte about the individual in question based on privileged information that had been leaked by an unknown source. (*Id.* ¶¶114-116.)

Weeks after the prostitution sting occurred, a hostage crisis developed at a location within Worthington Borough. (Compl. ¶120.) Both PSP and Worthington Borough police officers responded to the situation (*id.* ¶121) and, according to DeForte, "[t]ensions between the two departments were very strained." (*Id.* ¶122.) DeForte claims that, while on scene, the county district attorney "stated [to two other individuals] that he had to keep the peace between the two police departments because the Pennsylvania State Police hated Chief DeForte and other officers of the Worthington Borough Police Department." (*Id.* ¶124.)

On October 24, 2012, DeForte confronted Feeney regarding his theft of radios from the fire hall. (Compl. ¶125.) Feeney allegedly acknowledged taking the radios and inquired whether DeForte was investigating him. (*Id.* ¶126.) During the course of this conversation, DeForte referenced Feeney's practice of imposing citation quotas. (*Id.* ¶127.) DeForte also questioned Feeney about his use of improper use of police grant funds to purchase traffic control lights. (*Id.* ¶128.)

Two days later, on October 26, 2012, DeForte received word that the police department's computers and hard drives were missing. (Compl. ¶¶129-130.) DeForte went to the police department and confirmed the items were missing, along with all criminal investigation files concerning Feeney and the firearms transfer records that Feeney had signed. (*Id.* ¶¶131-133.) The missing items were taken without permission from either DeForte's private desk or a locked cabinet. (*Id.* ¶134.)

That evening, Feeney confronted DeForte in the Borough Council's room, screamed at him, and appeared as though he might physically attack DeForte. (Compl. ¶¶ 136, 138-139.)

5

Feeney indicated that he had the missing firearm transfer documents and was going to turn DeForte in to the ATF, suggesting that, without documentation of Feeney's approval of the firearm transfers, DeForte would be facing legal trouble. (*Id.* ¶140.) Feeney then instructed DeForte to collect his belongings and get out of the Police Department. (*Id.* ¶141.) Officer Townsend, another member of the police department, feared that Feeney would terminate him as well, as Townsend had initiated the investigation into Feeney's alleged theft of the radios. (*Id.* ¶¶143-144.) Townsend therefore made the decision to return his department-issued rifle to the police department and gather his personal belongings. (*Id.* ¶145.) While at the police department, Townsend photographed the gun safe contents in order to document the fact that he had returned his rifle; he also photographed the large envelope containing the adjudicated files and money from the prostitution sting operation. (*Id.* ¶¶146-147.)

According to the minutes from a Worthington Borough Council meeting, DeForte was suspended from his duties as Chief of Police on October 26, 2012 for alleged "insubordination and other possible offenses." (Compl. ¶11.) On November 5, 2012, he was terminated from his position at a Borough Council meeting that he was not permitted to attend. (*Id.* ¶¶12, 165.) Specifically, DeForte claims he was summoned to the Kittanning Pennsylvania State Police barracks prior to the November 5 meeting. (*Id.* ¶161.) Upon arriving, DeForte was advised that he should not attend the Council meeting where his termination was imminent. (*Id.* ¶163.) DeForte claims he felt threatened by these comments and perceived that he was being told he was not permitted to attend the meeting, which was open to the public. (Id. ¶¶163-165.)

Prior to the November 5, 2012 Council meeting, Townsend was similarly summoned to the Kittanning PSP barracks. (Compl. ¶166.) Townsend was informed by state police personnel that he was "definitely getting fired." (*Id.* ¶167.) During this meeting, Townsend showed PSP

6

personnel the pictures he had taken of the evidence locker and gun safe, which showed that the folder containing the adjudicated case files and money from the prostitution sting operation were in the gun case at the Worthington Borough Police Department. (*Id.* ¶¶168-169.)

At times relevant to this lawsuit, DeForte -- while serving as Worthington Borough's Chief of Police -- was also simultaneously employed as a police commander with the Pine Township Police Department. (Compl. ¶151.) In that capacity, DeForte served under Pine Township Police Chief Christopher Airgood. (*Id.*) At some point, DeForte entrusted Airgood with the Worthington Borough firearms documents, which Airgood kept secured at the Pine Township police department. (*Id.* ¶154.)

DeForte claims that, on or about October 30, 2012, Feeney and a Pine Township Supervisor broke into the Pine Township police department office and cut the locks off of DeForte's and Airgood's personal lockers. (Compl. ¶¶149-151.) Several days later, Pine Township's supervisors summarily terminated Airgood's employment and disbanded the Township's police department. (*Id.* ¶152.) The following day, Airgood collected his and DeForte's personal belongings from the police department. (*Id.* ¶153.) Airgood noticed that certain personal items or effects were missing, including the Worthington Borough firearms documents that were given to him by DeForte for safe keeping. (*Id.* ¶154.)

In the late spring or summer of 2013, Zandarski contacted an individual by the name of Sonja McClain concerning the investigation that DeForte had conducted in regards to the stolen radios. (Compl. ¶¶172-173.) McClain informed Zandarski that she had brought the theft of the radios to DeForte's attention and that DeForte had known about the stolen radios even before then. (*Id.* ¶¶174-175.) During this conversation, Zandarski accused McClain of sleeping with DeForte, to which McClain responded that she was friends with DeForte and DeForte's

girlfriend. (*Id.* ¶¶176-177.) McClain further advised Zandarski that DeForte's main suspect in regards to the stolen radios was Feeney. (*Id.* ¶178.)

In August 2013, DeForte left Worthington Borough to attend law school at the University of Massachusetts at Dartmouth. (Compl. ¶180.) At that time, DeForte was still an active police officer holding the rank of captain at the North Buffalo Township Police Department, which entity allowed DeForte to work a flexible schedule around his law school schedule. (*Id.* ¶181.) That fall, DeForte was escorted to the Dean's office and advised that he could not carry his service weapons on campus because he was not a police officer and therefore was not covered by the Law Enforcement Safety Act. (*Id.* ¶182-184.) DeForte produced his North Buffalo Township police credentials, which he claims were still valid, but the Dartmouth chief of police would not recognize them as legitimate. (*Id.* ¶185-187.) The Dartmouth chief of police then remarked that DeForte should "talk to the Pennsylvania State Police" as to why this was happening to him. (*Id.* ¶188.) DeForte was subsequently charged in Massachusetts with criminal firearms possession, but the charges were later dismissed. (*Id.* ¶¶190-191.)

In January 2014, around the same time that the Massachusetts charges were dismissed, Zandarski filed various theft-related charges against DeForte relating to a firearm,[3] the radios, and the money from the prostitution sting operation. (Compl. ¶192; *see also* Def.'s Ex. A, ECF No. 8-1.)[4] Zandarski subsequently appeared at DeForte's February 25, 2014 preliminary hearing, at which time he allegedly "manipulated the facts and gave false testimony so as to insure DeForte was held over for court." (Compl. ¶201.)

---

[3] Although it is not entirely clear from the Complaint, it appears that the firearm in question was Rifle A.

[4] As noted above, this exhibit – the official docket from Plaintiff's criminal proceedings – is a matter of public record which can be considered at the motion to dismiss stage. *See Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993)).

That same month, DeForte had a conversation with a former Worthington Borough official who claimed that he had overheard a conversation in November 2012 in which Feeney, Rodgers, and Rosen had discussed ways to ensure that DeForte would never again hold employment as a police officer. (Compl. ¶¶198-199.) According to DeForte, he was informed that the conversation among Feeney, Rodgers, and Rosen "alluded to illegal ways to make sure [he] would be arrested and prosecuted." (*Id.* ¶200.)

In the summer of 2014, DeForte received discovery materials from the district attorney's office relative to his criminal case. (Compl. ¶202.) DeForte claims that, upon receiving this information, he learned for the first time that PSP had previously been in possession of certain exculpatory evidence. (*Id.* ¶¶ 206-217.) This included:

(a) "documents that Mayor Feeney had signed, approving the transfer and control of Rifle A to [O]fficer Rodgers upon legal means"; (*id.* ¶215);

(b) information confirming the fact that Feeney had falsely denied signing the documentation and had falsely claimed that his signatures on the forms had been forged (*id.* ¶¶206-211, 215-216);

(c) photographs taken by Townsend of the prostitution sting money that were "contradictory to the charges filed against [Chief DeForte]," (id.¶214), and also at odds with photographs "that [O]fficer Rodgers, Mayor Feeney, and Constable/Councilman Rosen took, a few hours after Townsend took his photographs...[which] did not show the envelope containing the prostitution money" (*id.* ¶¶212-213); and

(d) two radios that PSP had collected from the Pine Township Supervisor that belonged to the Borough of Worthington (*id.* ¶217).

In August 2015, the Armstrong County District Attorney's office *nolle prossed* all of the criminal charges against DeForte. This lawsuit followed with the filing of DeForte's four-count Complaint (ECF No. 1). Count I of the Complaint asserts federal claims against Zandarski pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988. Counts II through IV assert state law claims for malicious prosecution, abuse of process, and intentional infliction of emotional distress, respectively.

Zandarski now moves this Court to dismiss all claims in the Complaint on grounds of Eleventh Amendment immunity, state sovereign immunity, and failure to state a claim upon which relief can be granted. The parties have filed their respective briefs (ECF Nos. 8 and 10), and the motion is now ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of cases that fail to state a claim upon which relief can be granted. Complaints must allege facts "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In assessing a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all "well-pleaded facts as true"; any legal conclusions set forth in the complaint must be disregarded. *Fowler*, 578 F.3d at 210–11 (citing *Iqbal*, 556 U.S. at 677); *Phillips v. Cty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008).

In reviewing a Rule 12(b)(6) motion, a district court generally may not consider matters outside of the complaint. "If, on a motion under Rule 12(b)(6) ..., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). An exception exists with respect to: (i) exhibits that are attached to the complaint; (ii) matters of public record; and, (iii) any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the document is integral to or explicitly relied upon in the complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

In this case, both parties have appended exhibits to their Rule 12(b)(6) briefs. Zandarski has submitted a copy of the docket from DeForte's state court criminal proceedings (Def.'s Exhibit "A," ECF No. 8-1). As this information is a matter of public record, it is appropriate for consideration at the Rule 12(b)(6) stage. DeForte has appended two exhibits, consisting of: a copy of the document bearing Feeney's signature and authorizing DeForte's transfer of Rifle A to Rodgers (Plaintiff's Exhibit "A," ECF No. 10-1); and documentation evidencing Zandarski's employment with Rodger's logging business (Plaintiff's Exhibit "B," ECF No. 10-2). These documents do not fall within the categories of extrinsic evidence that are appropriate for consideration at the Rule 12(b)(6) stage; accordingly, they will be disregarded for present purposes.[5]

## III.   ANALYSIS

### A.   Plaintiff's Federal Claims

In Count I of the Complaint, DeForte asserts claims against Zandarski, both individually and in his official capacity, pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988. As Zandarski correctly observes, DeForte's official capacity claims for damages are barred by the Eleventh Amendment to the U.S. Constitution, which generally precludes private citizens from filing suits against a state and its agencies in federal court. *See Kentucky v. Graham,* 473 U.S. 159, 165-67 (1985); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89 (1984).

Of course, a federal court plaintiff may file an official capacity suit against a state official when seeking only prospective injunctive relief, since "official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (citations and internal quotation marks omitted). However, no claim for

---

[5] The Court notes that DeForte is not prejudiced in this regard because he has essentially pleaded the factual content of his exhibits and, for present purposes, his well-pled averments are accepted as true.

prospective injunctive relief is set forth in the Complaint, nor could such a claim be stated against Zandarski based upon the facts alleged. Federal case law is plain that a §1983 plaintiff may obtain declaratory and/or prospective injunctive relief only where there is an on-going constitutional violation or imminent threat of constitutional harm. *See Celec v. Edin. Univ.,* 132 F. Supp. 3d 651, 668-69 (W.D. Pa. 2015) (discussing authority). No such circumstances are present here, based on DeForte's allegations. Consequently, DeForte's federal claims against Zandarski in his official capacity will be dismissed with prejudice. DeForte's federal claims against Zandarski in his individual capacity will be addressed in more detail below.

### 1. DeForte's Claims Under 42 U.S.C. §1983

We first consider DeForte's claims under 42 U.S.C. §1983, which provides a private right of redress as against:

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...

42 U.S.C. §1983. A plaintiff seeking relief under 42 U.S.C. § 1983 must demonstrate "that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005). Because there is no dispute that Zandarski acted under color of state law in his capacity as a Pennsylvania state trooper, the Court will focus its analysis on whether DeForte has alleged a deprivation of a right secured to him under the Constitution or federal law.

Count I of the Complaint asserts violations of DeForte's rights under the Fourth and Fourteenth Amendments. In support of these claims, DeForte alleges that Zandarski: (i) testified falsely against him at his preliminary hearing, (ii) filed false criminal charges against him; (iii)

manipulated evidence and/or provided misleading information to support the false criminal charges; and (iv) used the legal process in order to cover up the crimes of Feeney and Rodgers. DeForte claims that Zandarski brought the false criminal charges in order to curry favor with Rodgers, who employed Zandarski in connection with his logging business.

As a preliminary matter, the Court notes its agreement with Zandarski that DeForte cannot premise his §1983 claim on Zandarski's alleged act of providing false testimony at the preliminary hearing. It is well established that witnesses are immune from §1983 liability where the claim is based on allegations of perjury. *See Williams v. Hepting*, 844 F.2d 138, 142 (3d Cir.1988) ("Witnesses at trial are afforded absolute immunity to encourage complete disclosure in judicial proceedings."); *Benckini v. Upper Saucon Twp.,* No. CIV.A. 07-3580, 2008 WL 2050825, at *11 (E.D. Pa. May 13, 2008) (plaintiff's claim, although deficient, was independently barred because of the absolute immunity afforded to witnesses, including police officers, charged under § 1983 for alleged perjurious testimony at pretrial proceedings); *Ankele v. Hambrick*, No. CIV.A. 02-4004, 2003 WL 21223821, at *11 (E.D. Pa. May 7, 2003) (observing the "well settled" rule that police officers are absolutely immune from § 1983 suits for damages for allegedly giving perjured testimony at a criminal trial, and noting that "[t]he Third Circuit has extended this principle to the pretrial stage of the judicial process, which would include a preliminary hearing.") (citations omitted), *aff'd*, 136 F. App'x 551 (3d Cir. 2005).

Similarly, DeForte has not stated a basis for relief under §1983 to the extent he is complaining about Zandarski's conduct in allegedly covering up crimes committed by Feeney or Rodgers. It has long been recognized that civil plaintiffs lack standing to assert claims based on the defendant's failure to investigate or prosecute a third party. *See, e.g., Millhouse v. Samuals,* No. 1:15-CV-1644, 2015 WL 5954604, at *5 (M.D. Pa. Oct. 13, 2015) ("[C]ourts have long held

that a civil rights plaintiff may not seek relief in civil litigation in the form of an order directing the criminal prosecution of some third parties, finding that civil plaintiffs lack standing to make such claims and concluding that such relief simply is unavailable in a civil lawsuit.") (citing authority); *Brosky v. Miller*, No. CIV.A. 14-89, 2015 WL 853689, at \*5 (W.D. Pa. Feb. 26, 2015) ("Because Plaintiff has no constitutional right to have the inmates who assaulted him criminally charged, it follows that neither [District Attorney] Henecks nor [Detective] Carlissimo could have violated Plaintiff's constitutional rights by failing to do so."); *Snyder v. Aaron*, No. civ. A. 05-1602, 2006 WL 544466, at 2–3 (W.D. Pa. Mar. 6, 2006) (dismissing complaint for lack of standing where the plaintiff's claim was premised on the district attorney's failure to prosecute a third party); *Moyer v. Borough of North Wales*, No. CIV. A. 00-CV-1092, 2000 WL 1665132, at \*2 (E.D. Pa. Nov.7, 2000) ("Moyer has no judicially cognizable interest in Timothy Conley's criminal prosecution. Accordingly, an agreement to refrain from prosecuting Conley for sexual assault or to charge him with disorderly conduct or the act thereof violates no constitutional right that Moyer has standing to assert."); *Wise v. Augustine*, No. CIV. A. 97-2651, 1997 WL 534695, at \*2 (E.D. Pa. Aug.8, 1997) (stating that "[a] private citizen has no constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime").

The remainder of DeForte's allegations concern Zandarski's alleged involvement in filing false criminal charges and manipulating evidence and/or provided misleading information in order to support those charges. The Court will consider whether these aspects of the Complaint are sufficient to state a plausible Fourth or Fourteenth Amendment violation.

### i. The Alleged Fourth Amendment Violation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. CONST. amend. IV. To the extent DeForte is alleging a federal §1983 claim premised on a theory of malicious prosecution, the claim falls squarely within the Fourth Amendment's scope of protection against unreasonable seizures. *See Black v. Montgomery Cty.*, 835 F.3d 358, 364-65 (3d Cir. 2016), *as amended* (Sept. 16, 2016) (discussing the elements of a Fourth Amendment malicious prosecution claim).[6]

To prove a Fourth Amendment malicious prosecution claim, a plaintiff must show: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (emphasis added). *See also Black*, 835 F.3d at 364. Each of these elements must be satisfied in order for a plaintiff to prevail on a §1983 malicious prosecution claim. *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009).

For present purposes, Zandarski challenges only the last element. He contends that the allegations in the Complaint fail to establish a deprivation of DeForte's liberty that would be consistent with the concept of a Fourth Amendment "seizure."

A "seizure" occurs for Fourth Amendment purposes "when there is a governmental termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 550

---

[6] It is well established law that when a constitutional claim is covered by a specific constitutional provision, "the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 834-44 (1998). Accordingly, DeForte's malicious prosecution theory will be analyzed as a Fourth Amendment claim rather than as a Fourteenth Amendment due process claim.

U.S. 372, 381 (2007) (internal quotation marks and citation omitted). In a concurring opinion in

*Albright v. Oliver*, 510 U.S. 266 (1994), Justice Ginsburg expounded on this principle in the

context of situations that do not involve formal pretrial detention. Justice Ginsburg explained:

> A person facing serious criminal charges is hardly freed from the state's control
> upon his release from a police officer's physical grip. He is required to appear in
> court at the state's command. He is often subject, as in this case, to the condition
> that he seek formal permission from the court (at significant expense) before
> exercising what would otherwise be his unquestioned right to travel outside the
> jurisdiction. Pending prosecution, his employment prospects may be diminished
> severely, he may suffer reputational harm, and he will experience the financial
> and emotional strain of preparing a defense.

> A defendant incarcerated until trial no doubt suffers greater burdens. That
> difference, however, should not lead to the conclusion that a defendant released
> pretrial is not still "seized" in the constitutionally relevant sense. Such a
> defendant is scarcely at liberty; he remains apprehended, arrested in his
> movements, indeed "seized" for trial, so long as he is bound to appear in court
> and answer the state's charges. He is equally bound to appear, and is hence
> "seized" for trial, when the state employs the less strong-arm means of a
> summons in lieu of arrest to secure his presence in court.

*Id.* at 278–79 (Ginsburg, J., concurring).

Based on Judge Ginsburg's analysis, the Court of Appeals for the Third Circuit has

recognized the concept of a "continuing seizure." *See, e.g., Gallo v. City of Phila.*, 161 F.3d 217,

222–24 (3d Cir.1998); *see also Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011). In

particular, the court has advised that "[p]re-trial restrictions of liberty aimed at securing a

suspect's court attendance are all 'seizures' ... [because] the difference between detention in jail,

release on bond, and release subject to compliance with other conditions is in the degree of

restriction on the individual's liberty, not in the kind of restriction." *Schneyder*, 653 F.3d at 320

(emphasis in the original).

In *Gallo*, for example, the court ruled that the plaintiff, although never arrested or

detained, had nevertheless been "seizure" for purposes of a Fourth Amendment malicious

prosecution claim where he had been released post-indictment on a $10,000 personal

recognizance bond, was required to contact pretrial services on a weekly basis, was prohibited from traveling outside of Pennsylvania and New Jersey, and was compelled to attend all court hearings over an eight and one-half month period. 161 F.3d at 218, 222-24. Although the court considered it a "close question," *id.* at 222, it ultimately concluded that "the combination of restrictions imposed on Gallo, because they intentionally limited his liberty, constituted a seizure," *id.* at 225. The court further found that the relatively limited scope of the "seizure" was germane to the issues of damages rather than liability. *Id.* at 224-25.

More recently, in *Black v. Montgomery Cty., supra*, the court applied the "continuing seizure" concept in the context of a malicious prosecution case wherein the plaintiff, a resident of California, was prosecuted for alleged arson and related crimes in Pennsylvania. The court found that a number of alleged facts supported the plaintiff's claim that she had been "seized." Specifically, the plaintiff, having been charged with arson, faced serious criminal charges. 835 F.3d at 367. Less than one month after being interrogated by police and accused of committing arson, she flew from her home in California to Pennsylvania for her arraignment because a warrant had been issued for her arrest. *Id.* At the police station, she spent more than an hour being fingerprinted and photographed. *Id.* Thereafter, she was required to post unsecured bail of $50,000 and was told this would be forfeited if she did not attend all court proceedings. *Id.* at 367-68. Significantly, the plaintiff was required to fly from California to Pennsylvania for twelve pre-trial conferences in one year, presumably at her own expense. *Id.* at 368. Because she did not live in the jurisdiction in which she was tried, Black faced serious charges and the possibility of incarceration if she did not travel. *Id.* "[Her] life was presumably disrupted by the compulsion that she travel out of state a dozen times." *Id.* Given these circumstances, the court was satisfied that Black had alleged "constitutionally significant restrictions on [her] freedom of

movement for the purpose of obtaining h[er] presence at a judicial proceeding," and she was therefore "seized within the meaning of the Fourth Amendment." *Id.* (internal quotation marks and citation omitted) (alterations in the original). *See also Brantley v. Wysocki,* 662 F. App'x 138, 141 (3d Cir. 2016) ("To determine whether there was a deprivation of liberty [for purposes of a Fourth Amendment malicious prosecution claim], we may consider, *inter alia*, whether a plaintiff was incarcerated, was detained in the police station, posted bond, was required to contact pretrial services, was prohibited from travelling or was required to travel to attend court.").

In this case, DeForte has failed to allege comparable restraints on his liberty. He claims that he was charged by Zandarski for theft of a firearm, theft of the fire hall radios, and theft of the money from the prostitution sting operation. The docket sheet from DeForte's criminal proceeding indicates that these were second-degree felony and first-degree misdemeanor charges, so it is fair to say that the alleged criminal offenses – like the crimes at issue in *Gallo* and *Black* – were serious. However, the docket further indicates that DeForte was released on his own recognizance. DeForte does not aver that he was arrested or required to post bond. Further, he does not allege that he was restricted in his travel or required to report to the court on a regular basis prior to the case being *nolle prossed.* In short, there are no allegations indicating that DeForte was subjected to the type of "onerous" pretrial restrictions that might constitute a Fourth Amendment "seizure." *See DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir. 2005) (noting that "pretrial custody and some onerous types of pretrial, non-custodial restrictions constitute a Fourth Amendment seizure," and holding that plaintiffs were not "seized" for purposes of a Fourth Amendment malicious prosecution claim when they were only issued a summons, they appeared in court only at their municipal court trial for criminal trespass,

they were never arrested, they never posted bail, they were free to travel, and they did not have to report to pretrial services.).

DeForte claims that, as a result of the criminal charges, he was "publicly humiliated in public newspapers of wide circulation and on radio and television newscasts from Boston to Pittsburgh and the publication of internet news articles." (Compl. ¶193.) In addition to being publicly humiliated, DeForte claims that the false criminal charges destroyed his "life, law enforcement career, reputation, and future." (Id. ¶205.) The Complaint, however, does not provide factual content to support these allegations. In addition, the adverse consequences that DeForte experienced with respect to his reputation and employment prospects were not state-imposed restrictions designed to secure his appearance in court. *See Black*, 835 F.3d at 367 (defining "seizure" in terms of "[p]retrial restrictions of liberty aimed at securing a suspect's court attendance") (quoting *Schneyder*, 653 F.3d at 319). Moreover, DeForte does not cite any authority to suggest that courts within this circuit would view his circumstances as indicative of a Fourth Amendment seizure. Because DeForte has not alleged facts sufficient to satisfy the fifth element of his malicious prosecution claim, that claim will be dismissed.

### ii. The Alleged Fourteenth Amendment Violation

DeForte has also alleged violations of his Fourteenth Amendment rights. Although the Complaint does not specify which of the Fourteenth Amendment's various clauses he is invoking, it appears from context that he is alleging a deprivation of his due process rights. *See* U.S. CONST. amend XIV, §1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law").

In *Black v. Montgomery Cty., supra,* the Third Circuit Court of Appeals held that "an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state

19

actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." 835 F.3d at 371. The court cautioned that a §1983 plaintiff must overcome various "hurdles" in establishing a due process violation based on fabricated evidence. The court more recently summarized these "hurdles" as follows:

> A plaintiff must demonstrate a "meaningful connection" between the injury and the use of the fabricated evidence. [*Black*, 835 F.3d at 372 (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)]. There is also a requirement that the evidence be "so significant that it could have affected the outcome of the criminal case." *Id.* (quoting *Halsey*, 750 F.3d at 295). And, the standard required to demonstrate that evidence is fabricated is a "notable bar." *Id.* As an example, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Id.* (quoting *Halsey*, 750 F.3d at 295). Lastly, because we require "persuasive evidence supporting a conclusion that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith," *id.* (quoting *Halsey*, 750 F.3d at 295), we would look for allegations describing such evidence in a pleading designed to survive a motion to dismiss. Given those hurdles, we re-emphasized in *Black* that "we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case." *Id.* (quoting Halsey, 750 F.3d at 295).[1]

*Boseman v. Upper Providence Twp.*, No. 16-1338, -- F. App'x --, 2017 WL 758480, at *4 (3d Cir. Feb. 27, 2017) (footnote omitted).

Here, DeForte has alleged that Zandarski was in possession of certain evidence that he knew to be fabricated, including: (a) photographs taken by Feeney, Rodgers, and Rosen that falsely depicted a staged theft of cash, and (b) false statements by Feeney to the effect that DeForte had unlawfully transferred possession of Rifle A to Rodgers. If taken at face value, these allegations are sufficient to establish a "meaningful connection" between the allegedly fabricated evidence and the alleged constitutional injury, since there is a reasonable likelihood that, absent this evidence, DeForte would not have been charged with theft of the cash or the firearm. DeForte has alleged that Zandarski knew Feeney's statements to be false and was in

possession of Townsend's photographs, which exculpated DeForte of any wrongdoing. According to DeForte, Zandarski deliberately manipulated the facts and relied on fabricated evidence in order to support the filing of false charges, and thus curry favor with Rodgers, who employed Zandarski in connection with his private logging business.

For present purposes, DeForte's allegations are sufficient to state a plausible due process claim based on the alleged fabrication of evidence. In fact, Zandarski has not articulated any grounds to dismiss this claim. To the extent Zandarski's motion is directed at DeForte's Fourteenth Amendment due process claim, it is denied.

### 2. DeForte's Claims Under 42 U.S.C. §§ 1985 and 1986

DeForte also appears to assert claims under 42 U.S.C. §§ 1985 and 1986 in Count I of his Complaint. Neither claim states a viable cause of action.

Section 1985 provides a cause of action for conspiracies to interfere with civil rights. It consists of three subparts, none of which applies to the facts alleged in this case. Subsection (1) is facially inapplicable inasmuch as it "'prohibits two or more persons from interfering with a federal officer's performance of his duties.'" *Daniels v. Cynkin*, 597 F. App'x 704, 707 (3d Cir. 2015) (quoting *Desi's Pizza, Inc. v. City of Wilkes–Barre*, 321 F.3d 411, 423 n. 1 (3d Cir.2003)). Subsection (2) is also facially inapplicable inasmuch as it addresses conspiracies to obstruct the administration of justice by intimidating parties, witnesses, or jurors. Subsection (3) prohibits conspiracies to deprive persons of rights or liberties under federal law where the conspiracy is motivated by racial discrimination or some other class-based, invidiously discriminatory animus. *See Daniel*, 597 F. App'x at 707 (citations omitted); *Rivera v. Wesley*, No. CV 16-400-LPS, 2017 WL 936627, at *3 (D. Del. Mar. 9, 2017) ("It is a well-settled constitutional interpretation that 'intent to deprive of equal protection, or equal privileges and immunities, means that there must

be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'") (quoting ) (*Kush v. Rutledge*, 460 U.S. 719, 726 (1983)). Because there are no allegations of invidiously discriminatory intent in this case, no §1985(3) claim has been stated.[7]

Section 1986 provides a right of relief against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do . . . ." 42 U.S.C. §1986. Inasmuch as §1985 is not implicated by the facts pled in this case, no claim can be stated against Zandarski under §1986. *See Heath v. Shannon*, 442 F. App'x 712, 718 (3d Cir. 2011) (*per curiam*) ("Because [the plaintiff] failed to state a conspiracy claim under § 1985, the District Court properly ruled that his related § 1986 claims also failed.") (citation omitted); *Hayes v. C.E.O. of Morey's Pier*, No. CV 16-9063 (RBK/AMD), 2017 WL 65539, at *3 (D.N.J. Jan. 6, 2017) ("Because plaintiff failed to state a conspiracy claim under § 1985(3), he also fails to state a related § 1986 claim against all defendants.").

For the reasons stated, DeForte's claims under 42 U.S.C. §1985 and §1986 will be dismissed with prejudice.

### 3. DeForte's Claim Under 42 U.S.C. §1988

Finally, Count I purports to assert a claim under 42 U.S.C. §1988. Section 1988 provides, in pertinent part, that "[i]n any action or proceeding to enforce a provision of sections . . . 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing

---

[7] Section 1985(2) also requires that there be invidious, class-based discriminatory intent on the part of conspirators. *See Daniels v. Cynkin*, 597 F. App'x 704, 707 (3d Cir. 2015). Consequently, Subsection (2) is inapplicable to this civil action for that reason as well.

party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. 1988(b). The statute "creates no independent cause of action; it merely complements the various acts which do create federal causes of action for the violation of federal civil rights." *Hightower v. City of Phila.*, Civ.A No. 95–4490, 1995 WL 678661, at \*5 (E.D. Pa. Nov. 13, 1995) (citing *Tunstall v. Office of Judicial Support*, 820 F.2d 631, 633 (3d Cir.1987)). Thus, DeForte's right to recover counsel fees under § 1988 depends on whether he has stated a claim under § 1983, §1985, or §1986. *See id; see also Gelpi v. City of Phila.*, 183 F. Supp. 3d 684, 691 (E.D. Pa. 2016) ("Because Plaintiff's §§ 1981, 1983, and 1985 claims have all been dismissed, we similarly grant the City's Motion to Dismiss Count 1 insofar as it asserts a claim to attorney's fees pursuant to § 1988.")

As discussed above, DeForte has pled a §1983 due process claim that is sufficient to overcome a Rule 12(b)(6) dismissal. Consequently, DeForte's claim for attorney's fees presently survives as well. Zandarski's motion to dismiss Count I will be denied insofar as it relates to DeForte's claim for counsel fees under 42 U.S.C. §1988.[8]

## B. Plaintiff's State Law Claims

### 1. Sovereign Immunity

In Counts II through IV of the Complaint, DeForte asserts claims under Pennsylvania law for malicious prosecution, abuse of process, and intentional infliction of emotional distress, respectively. Zandarski contends that all three claims are barred by virtue of the Commonwealth's sovereign immunity.

The doctrine of sovereign immunity protects "the Commonwealth, and its officials and employees acting within the scope of their duties . . . from suit except as the General Assembly

---

[8] Obviously, Plaintiff cannot assert a stand-alone cause of action pursuant to §1988. Accordingly, to the extent Plaintiff is attempting to assert a substantive cause of action under §1988, such claim is dismissed with prejudice.

shall specifically waive the immunity." 1 Pa. Stat. and Cons. Stat. Ann. § 2310. A limited waiver of sovereign immunity has been granted relative to certain negligent acts not applicable here, namely: (1) vehicle liability, (2) medical-professional liability, (3) care, custody or control of personal property, (4) Commonwealth real estate, highways and sidewalks, (5) potholes and other dangerous conditions, (6) care, custody or control of animals, (7) liquor store sales, (8) National Guard activities, and (9) toxoids and vaccines. 42 Pa. Stat. Cons. Ann. § 8522(b) (West 2016).

Outside of this limited waiver, the doctrine of sovereign immunity bars suit against the Commonwealth or state employees whenever they are acting within the scope of their official duties. *Zanetti v. Goss*, No. CV 16-379, 2016 WL 6583727, at *5 (W.D. Pa. Nov. 4, 2016); *Larsen v. State Employees' Ret. Sys.*, 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008). The protection applies regardless of whether Commonwealth employees are sued in their official or individual capacities. *Id; see also Becker v. Godboldte*, No. 10-2066, 2011 WL 2015213, at *9 (M.D. Pa. May 24, 2011) ("Plaintiff's state law claims do not escape the application of sovereign immunity simply because Defendant was sued in his individual capacity."). Moreover, sovereign immunity protects Commonwealth employees even with respect to intentional torts. *Zanetti,* 2016 WL 6583727, at *2; *Kull v. Guisse*, 81 A.3d 148, 157 (Pa. Commw. Ct. 2013) (holding that "there is no waiver of sovereign immunity for intentional tort claims"), *appeal denied*, 91 A.3d 163 (Pa. 2014).

Consequently, "where the cause of action emanates from intentional tort claims and [the Defendant Troopers are] Commonwealth employee[s], the only question to be resolved to determine if immunity attaches is whether [the Troopers were] acting within the scope of [their] duties as a state trooper" when they committed the complained of acts. *Mohammed v. John Doe*

*Pa. State Police Sup'rs*, No. CIV.A. 11-5004, 2013 WL 5741788, at *11 (E.D. Pa. Oct. 23, 2013) (internal quotation marks and citation omitted). "When determining if conduct is within the scope of an employee's duties, courts look to see if [the conduct] is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer; and if force is intentionally used by the employee against another; it is not unexpected by the employer." *Zanetti*, 2016 WL 6583727, at *2 (internal quotation marks and citation omitted) (alteration in the original); *see also Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (holding that "conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master...").

Here, DeForte has alleged that Zandarski held supplementary employment in Rodger's logging business and that, in initiating false criminal charges against him and manipulating the evidence in support of those charges, Zandarski was acting to curry favor with Rodgers. DeForte further alleges that Zandarski "was acting in contradiction to his duty [as a state trooper] and was not focused on the Pennsylvania State Police's Core Purpose: To seek justice, preserve peace, and improve the quality of life for all." (Compl. ¶226; *see id.* ¶227.) The reasonable implication of these averments is that Zandarski was *not* acting in the interests of the Pennsylvania State Police when, allegedly, he knowingly filed false criminal charges against DeForte. *Gerhart v. Com. of Pa.*, No. CIV.A. 09-CV-1145, 2009 WL 2581715, at *9 (E.D. Pa. Aug. 13, 2009) (where plaintiff alleged that defendant state troopers, knowingly conspired with a private citizen to evict plaintiffs "for the very purpose of avoiding the necessity of securing a lawful court

order," court found it "plausible that Defendant State Troopers' alleged conduct neither benefited their employer nor was incidental to their employer's business of upholding the law").

DeForte's allegations are sufficient at this stage of the proceedings to withstand the defense of sovereign immunity. Accordingly, Counts II through IV will not be dismissed on that basis. To the extent Zandarski's motion is premised on the doctrine of sovereign immunity, it will be denied without prejudice, so that Zandarski may assert the defense, if appropriate, on a more developed record.

### 2. Abuse of Process

As to Count III of the Complaint, Zandarski argues in the alternative that DeForte's abuse of process claim in Count III should be dismissed for failure to allege actionable misconduct. The Court agrees that Count III is subject to dismissal on this basis.

To demonstrate abuse of process, the plaintiff must prove that "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. Ct. 1993). *See also Price v. City of Phila.*, No. CV 15-1909, 2017 WL 895586, at *19 (E.D. Pa. Mar. 7, 2017). "'[T]he gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perversion of it.'" *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304 (3d Cir. 2003) (alteration in original) (quoting *McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987)). "A 'perversion' of legal process occurs when a party uses the process 'primarily to accomplish a purpose for which the process was not designed.'" *Id.* (quoting *Dumont Television & Radio Corp. v. Franklin Elec. Co. of Phila.*, 154 A.2d 585, 587 (Pa. 1959)). Consequently, "'there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive or spite

or ulterior purpose of benefit to the defendant.'" *Id.* at 305 n.2 (quoting *Rosen*, 627 A.2d at 192). Illegitimate purposes include, for example, "extortion, forcing a defendant to surrender a legal right, or blackmail." *Mawson v. Pittson Police Dep't*, No. 13-1714, 2014 WL 3735133, at *10 (M.D. Pa. July 28, 2014). Notably, "'[a]buse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish.'" *Gen Refractories Co.*, 337 F.3d at 305 (quoting *In re Larsen*, 616 A.2d 529, 592-93 (Pa. 1992)).

In this case, Zandarski is accused of using legal process to achieve its intended purpose (namely, to subject DeForte to criminal charges) for reasons motivated by an improper ulterior motive (*i.e.*, to ruin DeForte's policing career and curry favor with Rodgers). Stated differently, DeForte does not allege an after-the-fact, improper perversion of process that was properly initiated; rather, he alleges the wrongful initiation of process in the first instance. The essence of these allegations is malicious prosecution, not abuse of legal process. Because DeForte's averments do not amount to an abuse of process, Count III of the Complaint will be dismissed.

## C. **Amendment**

The United States Court of Appeals for the Third Circuit has held that, before dismissing a case for failure to state a claim, a court must give the plaintiff an opportunity to amend the complaint, whether or not the plaintiff has asked to do so, unless it would be inequitable or futile. *See Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007) (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)). Based on the analysis set forth above, it does not appear that further amendment would cure the defects in DeForte's official capacity claims at Complaint Count I, his individual capacity claims under 42 U.S.C. §§1985 and

27

1986 at Count I, his §1983 claim for malicious prosecution at Count I, or his state law abuse-of-process claim at Count III. Accordingly, those claims will be dismissed with prejudice.

## IV.   CONCLUSION

For the reasons set forth above, Defendant Zandarski's motion to dismiss the Complaint (ECF No. 7) will be granted in part and denied in part. Specifically, the motion is granted as to all of DeForte's claims against Zandarski in his official capacity at Count I of the Complaint, which claims shall be dismissed with prejudice.

Defendant's motion will also be granted with respect to DeForte's individual-capacity claims against Zandarski under 42 U.S.C. §§ 1985 and 1986 at Count I of the Complaint, which claims shall be dismissed with prejudice.

As to DeForte's individual capacity claims against Zandarsky under 42 U.S.C. §1983 at Count I of the Complaint, Defendant's motion will be granted as to DeForte's malicious prosecution claim only, and that claim will be dismissed with prejudice.

Finally, Defendant's motion will be granted with respect to the abuse of process claim at Count III of the Complaint, which claim shall be dismissed with prejudice. In all other respects, the Defendant's motion to dismiss will be denied.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: March 24, 2017