**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM DEFORTE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE BOROUGH OF WORTHINGTON ET AL, | ) |
| | ) |
| Defendants. | ) |

2:16-cv-67
2:16-cv-113

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Plaintiff William DeForte was fired from his position as Chief of Police of Worthington Borough after failing to provide security for the town's annual Halloween Parade. The Pennsylvania State Police, acting on information provided by Borough officials, then investigated a series of suspicious firearms transfers, stolen police radios, and stolen cash from a prostitution sting operation. This investigation ultimately led the Armstrong County District Attorney's Office to charge Plaintiff with multiple theft-related crimes. The charges were eventually dropped, and Plaintiff sued several Borough officials and the Pennsylvania State Police Corporal responsible for the investigation under federal and state law. Under Plaintiff's theory, the Defendants knowingly fabricated inculpatory evidence and ignored exculpatory evidence in an effort to destroy Plaintiff's career as a police officer. Defendants have moved for summary judgment on all of Plaintiff's claims. For the reasons that follow, Defendants' motions will be granted.

## I.  BACKGROUND

### A.  Facts

The following material facts are undisputed[1] unless otherwise noted.

### i.  Worthington Borough and the Parties

Worthington Borough has a population of between 500 and 600 people and occupies an area of less than one square mile. (Defs.' Joint Statement of Undisputed and Material Facts ("Defs.' SUMF"), ECF No. 108, ¶ 5; Plaintiff's Response to Defendant's Joint SUMF ("Pl.'s Response"), ECF No. 147, ¶ 5.)[2]  Plaintiff William DeForte was the Chief of Police of the

---

[1] The facts are taken from the evidence of record that is either undisputed as indicated by the parties, or not fairly disputed on the record. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, Plaintiff failed to respond to the Defendants' Joint Concise Statement of Material Facts ("SUMF") as required by Local Rule 56.1A(1) and this Court's Standing Order on Motion Practice, until nearly a month after his deadline to do so, and fifteen (15) days after Defendants filed their Responses apprising him of the error, and after Defendants had already filed their Response to his Statement of Material Facts. (*See* Plaintiff's Response to SUMF, ECF No. 147.) He also filed his own Statement of Undisputed and Material Facts, ECF No. 133, one day late. On this basis, Defendants urge the Court to admit their SUMF in its entirety and bar Plaintiff from attempting to create a genuine issue of disputed fact through his own Statement. (Defendants' Joint Response to Plaintiff's Statement of Undisputed and Material Facts, ECF No. 135, at 2). Defendants have further moved the Court to strike Plaintiff's Response. (*See* Joint Motion to Strike Plaintiff's Response to Defendants' Joint Concise Statement of Material Facts, ECF No. 151.)

Although the Court would be "*entitled* to deem [Defendants'] statement of facts as admitted," *Smith v. Addy*, 343 F. App'x 806, 808 (3d Cir. 2009) (emphasis added), the Court declines to do so because unlike in Defendants' cited authority, Plaintiff filed his own Statement of Undisputed and Material Facts along with his opposition. The Court will also consider Plaintiff's Reply to Defendant's Joint SUMF, at ECF No. 147, to be filed *nunc pro tunc*. The Court will deny Defendants' Motion to Strike at ECF No. 151.

[2] For efficiency, the Court omits separate citations to Plaintiff's Response, where Plaintiff clearly admits to a fact contained in Defendants' Statement of Material Facts. Similarly, the Court omits separate citations to Defendants' Response to Plaintiff's Statement of Material Facts where Defendants clearly admit to a fact contained in Plaintiff's Statement of Material Facts. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

Further, as a general matter and as noted in footnotes that follow, Plaintiff's Response to Defendants' Statement of Material Facts, and his Plaintiff's Statement of Undisputed and Material Facts, are largely non-compliant with Local Civil Rule 56.1 and contain improper arguments, conclusions, and purported disputes of fact without proper citation to the record. *For instance, at least 95 of the 144 paragraphs in Plaintiff's SUMF cite to exhibits that either do not exist or do not support Plaintiff's statements.* Plaintiff's SUMF also refers to facts that are irrelevant to the case, and do not relate to his present claims against Defendants. It also repeatedly refers to "unlawful" conduct by Defendants—an inappropriate legal conclusion. Where the Court reads Plaintiff's SUMF to directly contravene a statement in Defendants' SUMF with proper citation to the record, it has made note of that contravention. As will be seen in the footnotes that follow, for these reasons, Plaintiff makes innumerable "factual" assertions that are not grounded in any record facts.

Worthington Borough Police Department ("Worthington PD" or "Department") from March, 2010, to October, 2012. (Defs.' SUMF, ¶¶ 1, 7.) Defendant Kevin Feeney was the Mayor of Worthington Borough from 2005 to 2016. (Defs.' SUMF, ¶ 2.) Defendant Gerald Rodgers was the Chief of the Worthington PD from November, 2012, to October, 2016. (Defs.' SUMF, ¶ 3.) Defendant Corporal Joseph Zandarski is a Pennsylvania State Police ("PSP") Trooper. (Defs.' SUMF, ¶ 4.)

DeForte and Rodgers did not always get along, and but DeForte was responsible for promoting Rodgers to Sergeant. (Pl.'s Statement of Undisputed and Material Facts ("Pl.'s SUMF"), ECF No. 133, ¶ 10; Defs.' Joint Response to Pl.'s SUMF ("Defs.' Response") ECF No. 135, ¶ 10.)

### ii. Firearms Purchases

As Chief of Police, DeForte reported to the Borough Council and Defendant (then-Mayor) Feeney. (Defs.' SUMF, ¶ 8.) DeForte could purchase guns and other equipment for the Department through the Borough. (Defs.' SUMF, ¶ 11.) According to the Borough Code, Feeney was responsible for overseeing the Department, but did not have the authority to make purchases for the Department. (Defs.' SUMF, ¶ 9.)[3] The Borough Council would appropriate funds if it

---

Based on the nature of these filing, the nature and timing of Plaintiff's other filings in this case, his seeming disregard for procedural rules, and the rather disjointed or even odd nature of some of the legal arguments made in Plaintiff's briefing (for instance, that the Supreme Court's qualified immunity analysis in *Kisela v. Hughes* does not apply because there the plaintiff alleged a Fourth Amendment, rather than a Fourteenth Amendment, violation, (Pl.'s Br., ECF No. 127, at 24)), there is reason to believe that Plaintiff may be "reverse ghostwriting" his own legal papers under his counsel's name. While the Court does not and need not make any finding or conclusion on this issue, the Court notes that Counsel, as an officer of the Court, has a duty of candor to this tribunal under Pennsylvania Rule of Professional Conduct 3.3. The Court reminds Counsel that he may not suborn the unauthorized practice of law or delegate his professional responsibilities of compliance with the Federal Rules of Civil Procedure, the Local Rules, and this Court's Rules to a client or any other individual who is not admitted as a lawyer to the Bar of this Court. *See In re Howard Neil Shipley*, 135 S. Ct. 1589 (2015).

[3] Plaintiff avers that Feeney did not have authority for purchases from funds out of a police emergency grant the Borough had received. (Pl.'s Response ¶ 9.) He refers to Borough Secretary/Treasurer David Conoran's testimony in an Omnibus Hearing in the Armstrong County case, *Commonwealth v. DeForte*, No. CP-03-CR-0000184-2014, in

approved a recommended purchase. (Defs.' SUMF, ¶ 10.) The Borough would maintain ownership of any purchased firearms. (Defs.' SUMF, ¶ 12.)[4]

DeForte used grant funds to purchase a lower assembly for an Armalite M15 (an AR-15 style rifle) for the Borough. (Defs.' SUMF, ¶ 13.) Worthington Borough owned the lower assembly. (Defs.' SUMF, ¶ 14.) The Borough purchased the upper assembly for the M15 on April 19, 2011. (Defs.' SUMF, ¶ 15.)[5]

On May 31, 2012, DeForte drafted a document purporting to transfer ownership of the assembled Armalite M15 to Rodgers upon his separation from the Department, provided that Rodgers worked for the Department for twelve months. (Defs.' SUMF, ¶ 19; Defs.' Ex. F, (May 12, 2012 Memo.")) DeForte presented this document to Feeney, who signed multiple copies of it. (Defs.' SUMF, ¶¶ 20 & 22.) At some point, Rodgers requested a receipt of purchase and DeForte gave him the document. (Defs.' SUMF, ¶ 21.)

### iii. Prostitution Sting

In late August or early September, 2012, DeForte initiated a prostitution sting operation in the Borough, targeting individuals attempting to solicit undercover officers. (Defs.' SUMF, ¶

---

which Conoran said that "sometimes things didn't always go through council," implying that such exceptions went through Feeney. (Omnibus Hg. Tr., at 37.) This difference is not material for purposes of summary judgment.

[4] Plaintiff denies this statement on the basis that the Borough would maintain ownership of such firearms, contending that "the Borough would act as a conduit, and . . . the equipment would always be in the possession of the officers." (Pl.'s Response ¶ 12.) He refers to Feeney's testimony at the Omnibus Hearing that, when Plaintiff attempted to start a SWAT Team in the Borough, the officers were told they could purchase their own rifles. (Omnibus Hg. Tr., at 16–17.) This testimony does not create a dispute as to whether the Borough maintained ownership of firearms the Police Department purchased. It also does not address why a one-square-mile borough of fewer than 600 residents would have a need for its own SWAT Team.

[5] Plaintiff denies that the Borough purchased the upper assembly, pointing to Conoran's testimony that he did not remember whether the Borough wrote a check for the Armalite AR-15. (Pl.'s Response, ¶ 15.) This testimony does not establish a dispute as to whether the Borough purchased the assembly. Plaintiff's SUMF at paragraph 14, in an attempt to dispute whether the Borough purchased the upper, also cites to Plaintiff's Exhibit 20.a, which is an advertisement from a company called Quantico Tactical Supply and a blank firearms purchasing form. It does not support Plaintiff's statement that he purchased the upper. (*See* Pl.'s SUMF, ¶ 14.)

23.) Officers Nicole Traister and Evan Townsend helped DeForte execute the sting. (Defs.' SUMF, ¶ 25.) Traister placed the money obtained from each sting operation in separate evidence envelopes, which DeForte in turn placed in the Department's evidence locker. (Defs.' SUMF, ¶ 26.) Apparently on DeForte's orders, Traister did not identify the type of bills placed in the envelopes. (Defs.' SUMF, ¶ 27.)[6] As Chief of Police, DeForte had the key to the evidence locker. (Defs.' SUMF, ¶ 28.) It is disputed whether Feeney, in his capacity as Mayor, had a second key to the evidence locker. (Defs.' SUMF, ¶ 28; Pl.'s Response ¶ 28.)[7]

### iv. Pine Township Police Department

During his tenure at the Worthington PD, DeForte was also involved in attempting to get a police department for Pine Township up and running. (Defs.' SUMF, ¶ 29.) On October 10, 2012, DeForte advised the Worthington Borough Council that Pine Township was interested in buying a 1998 Crown Victoria from the Borough, as a police car. (Defs.' SUMF, ¶¶ 30–32.) The Worthington Borough Council held discussion, noted that the Crown Victoria would need its radio taken out before selling it, and then voted to authorize the sale of "the 1998 police car to Pine Township as is for $1,000.00 and a hand held portable radio." (Defs.' SUMF, ¶¶ 31–32.)[8]

---

[6] Plaintiff's Response to this fact is simply "Denied." without setting forth any basis for the denial with appropriate reference to the record as required by Local Rule 56.1. This response is insufficient to create a factual dispute.

[7] The PSP's affidavit of probable cause states that "Mayor Feeney and Chief Rodgers advised that DeForte was the only one with a key to the evidence locker." (Defs.' Ex. R, ECF No. 115–19, at 7.) In his deposition, Plaintiff testified that he purchased the locker from a Blockbuster that was going out of business, and that the owner provided one key, and then there was another key in an envelope taped inside the evidence locker. (Defs.' Ex. A, ECF No. 115–2, at 52.) Plaintiff then said he made a copy of his key (not the one in the envelope) to Feeney. (*Id.*) Feeney testified that he did not have a key to the evidence locker, and Rosen submitted an affidavit stating that he did not have a key to the evidence locker. (Defs.' Ex. B, ECF No. 115–3, at 34.) Borough Secretary Conoran testified in a deposition in another case that Plaintiff and Feeney both had keys to the evidence locker. (Omnibus Hg. Tr., at 39.) Plaintiff offers no explanation why, if Feeney had a key to the locker, he would have needed to cut the lock off of the evidence locker, as Plaintiff claims he did. (Defs.' Ex A, ECF No. 115–2.) Ultimately, this dispute comes down to credibility and is not one for the Court to resolve, but it is immaterial in any event.

[8] Plaintiff contends that Borough Council Secretary David Conoran later "corrected" the statement about one radio to say that there were "two" radios to be sold. (Pl.'s Response ¶ 32.) He cites to Conoran's testimony in the Omnibus Hearing on November 3, 2014, where Conoran said it was his understanding that two radios were sold to

On October 15, 2012, DeForte then emailed the Pine Township Secretary, stating "[c]an you get a check to Worthington Borough for $1000.00? I also obtained two radios, a brand new light bar and front crash bar for free." (Defs.' SUMF, ¶ 33.)

On November 2, 2012, Pine Township's Township Supervisor, Clyde Moore found two Kenwood-brand radios with chargers that did not belong to Pine Township in the area designated for the police department. (Defs.' SUMF, ¶ 34.)[9] He turned the radios over to the Pennsylvania State Police, who placed them into evidence. (Defs.' SUMF, ¶¶ 35–36.) Feeney identified the two radios as belonging to Worthington Borough. (Defs.' SUMF, ¶ 38.)[10]

Ten days later, on November 12, 2012, Pine Township's Meeting Minutes reflected that its fledgling police department had been disbanded, that "some of the officer[s] brought items from Worthington Borough to Pine Township and were not authorized to do so," and that "[t]he items were given back to Worthington Borough and Clyde Moore met with the Pennsylvania State Police regarding the stolen items." (Defs.' SUMF, ¶ 37.)

### v. October 26, 2012

On October 26, 2012, the Borough held its annual Halloween parade. (Defs.' SUMF, ¶ 39.) Although police presence was expected, Feeney began to receive calls from Borough residents wanting to know where the police officers were not at the parade. (Defs.' SUMF, ¶

---

Pine Township. (Omnibus Hg. Tr., at 44.) This testimony from approximately two years later, does not create a dispute as to the contents of the Council's contemporaneous meeting minutes.

[9] Plaintiff denies this statement on the basis that "Clyde Moore acted on information that Feeney provided." (Pl.'s Response, ¶ 34.) This contention does not create a factual dispute as to whether Clyde Moore found two radios that he did not think belonged to Pine Township.

[10] Plaintiff disputes this fact, stating that "Defendant Feeney promised two brand new radios to Pine Township, for taking out the old radios from the vehicle sold to Pine Township." (Pl.'s SUMF, ¶ 49.) However, Plaintiff's record citation for this assertion (Plaintiff's Exhibit 8, page 186, lines 22–25) does not provide proper support because Exhibit 8 does not have a page 186. Out of an abundance of caution, the Court has reviewed page 18 and page 16 of the Exhibit, at ECF No. 124–21, and neither mentions any radios. Plaintiff has therefore not established a dispute of material fact.

41.)[11] DeForte had attempted to organize a sit-out of the officers because he believed Feeney had improperly taken the Department's computer system. (Defs.' SUMF, ¶ 42.)

Feeney arrived at the Department at approximately 7:30 p.m., but DeForte would not address his concerns about the lack of police presence at the parade. (Defs.' SUMF, ¶ 43–44.) Feeney then suspended DeForte for neglect of duty, until the Borough Council meeting scheduled for November 5, 2012. (Defs.' SUMF, ¶ 45.)[12] DeForte left, taking a number of items, including gun cases, a TV, a Blu-Ray player, a surround-sound system, his JNET log and logbook, and other items. (Defs.' SUMF, ¶ 46; Defs.' Ex. A, ECF No. 115–2, DeForte Dep., at 58; Pl.'s Response ¶ 46.)[13] DeForte was terminated as Chief of Police at the November 5, 2012, Council Meeting. (Defs.' SUMF, ¶ 47.)

### vi. Evan Townsend

DeForte spoke to Borough Officer Evan Townsend after he was suspended and told Townsend what happened. (Defs.' SUMF, ¶ 48.) Townsend, thinking he would also be fired, went to the Department at approximately 2:00 a.m. on October 28, 2012, to return his rifle and Taser and to pick up personal items belonging to him and DeForte. (Defs.' SUMF, ¶ 49.) Townsend opened the gun safe to return his rifle (another Armalite M15 rifle, property of Worthington Borough) and Taser. (Defs.' SUMF, ¶ 51.)[14] DeForte had told him to put the rifle

---

[11] Plaintiff denies this statement on the basis that "Plaintiff did not witness phone calls by Borough residents" and that he had provided patrols for the parade. (Pl.'s Response, ¶ 41.) This contention is unresponsive to whether Feeney received phone calls from Borough residents.

[12] Plaintiff's denial is not responsive to the fact that Feeney suspended DeForte.

[13] Plaintiff contends that Feeney "intercepted" and "retained" other personal belongings of his, but cites only to his own deposition testimony from another case that "the rest of my stuff never made it [to Pine Township]." (Pl.'s Ex. 6.1, ECF No. 124–15, at 46.) This citation does not suffice to create a material dispute of fact.

[14] Plaintiff denies the factual statements in Defendants' SUMF at paragraphs 50–52, 61, 64–68, 72–76, 80–82, 85–90, 93–95, 104, 116, 119, 151–52, 154, 156–57, 162, 164–65, 167, 169–171, 179–80, 183–87, and 195–97, solely on the basis that "Plaintiff was not present" during the events described and "has no knowledge as to the accuracy of these alleged statements," or "cannot physically confirm or deny" what happened, or statements along similar lines.

back in the safe. (Defs.' SUMF, ¶ 53.) The gun safe was accessible to anyone in the Department, as well as Borough Secretary David Conoran. (Defs.' SUMF, ¶ 54.)

Townsend removed a plastic "mailbox" containing court documents for all Borough police officers. (Defs.' SUMF, ¶ 56.) Townsend took photographs[15] of the gun safe's interior. (Defs.' SUMF, ¶ 57.) He also photographed the evidence locker and other miscellaneous items taken from the department. (Defs.' SUMF, ¶ 58.) Townsend's photograph of the gun safe, reproduced below, shows an unidentified folder in the lower righthand corner. (Defs.' SUMF, ¶ 60; Exhibit M, ECF No. 108–14.)



Besides not complying with Local Rule 56.1's requirement that any denial include a citation to the record, these denials appear to misconstrue the very purpose of a response to a statement of material fact, namely, to say why that fact is incorrect or disputed. It does not matter whether Plaintiff himself was physically present for the events at issue in the case. What matters is whether there is sufficient doubt as to a material fact to permit it to go to the jury—that is, can reasonable people differ as to the significance of the fact, or is the evidence subject to conflicting interpretations? Plaintiff's blanket denials, presented without support from the record, do not establish a dispute as to these facts.

[15] It is disputed whether Plaintiff told Townsend to take photographs. Although this fact bears on the overall piscine nature of the events of the wee hours of October 28, 2012, this dispute is ultimately immaterial.

### vii.   Suspicions of a Break-in at the Police Department

Rodgers arrived at the Department in the morning of Sunday, October 28, 2012, to prepare for court on Monday morning. (Defs.' SUMF, ¶ 61.) He noticed the mailbox was missing, as well as a bank of radios. (Defs.' SUMF, ¶ 62–63.) He called Feeney to inform him of the missing items. (Defs.' SUMF, ¶ 64.) Feeney arrived and observed that filing cabinet drawers were out and personal lockers were open. (Defs.' SUMF, ¶ 65–66.) The gun safe and the evidence locker were both locked. (Defs.' SUMF, ¶ 67–68.) Feeney and Rosen did not take any photographs at the Department on October 28, 2012. (Defs.' SUMF, ¶ 83.)[16] On October 29, 2012, DeForte brought a Borough laptop and power cord to the PSP barracks. (Defs.' SUMF, ¶ 84.)

On the morning of October 31, 2012, more suspicious changes were discovered. (Defs.' SUMF, ¶ 71.) The window in the Borough meeting room appeared to have been tampered with and there was a foot path in the grass leading to the window. (Defs.' SUMF, ¶ 71.) Inside the building, additional evidence property inventory sheets from 2012 with DeForte's name on them had been added to the property log book, a body armor carrier had been returned, and additional personal files belonging to DeForte and Townsend had been removed. (Defs.' SUMF, ¶ 71.)

---

[16] Plaintiff contends that Rodgers and Feeney cut off the locks from all of the lockers and cabinets in the Worthington municipal building, (Pl.'s SUMF, ¶ 85,) and took photographs of the open lockers, gun safe, and police department, (*Id.* ¶ 86.) However, the photographs to which Plaintiff refers, at Exhibits 14.b, 14.c, 14.d, 14.e, 14.f, and 14.g, are all photographs taken by Barry Rosen on November 28, 2012, during Detective Davis's inventory of the Department. Furthermore, Plaintiff's citation to Borough Secretary David Conoran's testimony in another matter that when he went to work that Monday locks had been cut off of some police lockers, does not establish that Rodgers or Feeney cut off any locks. His testimony that *he had been told* Feeney and Rosen cut the locks off, (*see* Pl.'s Ex. 4, 12:14–22,) is hearsay testimony not fitting within any exception listed in the Federal Rules of Evidence, and the Court therefore will not consider it for purposes of summary judgment. *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000).

### viii. Pennsylvania State Police and Armstrong County District Attorney Involvement

On October 28, 2012, Defendant Corporal Zandarski took a call from Worthington Borough reporting suspicious activity at the Department. (Defs.' SUMF, ¶ 72.) Zandarski, a stranger to the Borough, went to the Department and met with Feeney, Rosen, and Rodgers. (Defs.' SUMF, ¶ 73.) They informed him that property was missing from the Department. (Defs.' SUMF, ¶ 74.) Zandarski advised the Borough officials to consult with the District Attorney to conduct an inventory, and told them that the State Police would not involve themselves with that process. (Defs.' SUMF, ¶ 76.)

Feeney then left a voicemail for DeForte, telling him to return the missing property. (Defs.' SUMF, ¶ 77.) Rodgers requested that DeForte meet Feeney and Rodgers at the Pennsylvania State Police to return missing property and the evidence locker key. (Defs.' SUMF, ¶ 78.) Plaintiff met Rodgers at PSP Kittanning and provided court hearing notices, a Borough speed timing device, and the key. (Defs.' SUMF, ¶ 79.) Feeney and Rodgers then placed a second lock and evidence tape on the evidence locker. (Defs.' SUMF, ¶ 80.) The keys to the first and second locks were maintained by two different people. (Defs.' SUMF, ¶ 81.) The Borough began to inventory the Department's equipment, which they completed on Tuesday, October 30, 2012, in the evening. (Defs.' SUMF, ¶ 82.) Zandarski briefed his supervisor, Corporal Murphy, on the matter on October 29, 2012. (Defs.' SUMF, ¶ 85.)

The Armstrong County District Attorney's Office asked Detective Roberta Davis to take an inventory of the Worthington PD evidence locker. (Defs.' SUMF, ¶ 86.) On November 28, 2012, Detective Davis met Rosen and Rodgers at the Department to conduct the inventory. (Defs.' SUMF, ¶ 87.) As noted above, the locker had been locked with two locks and wrapped in evidence tape. (Defs.' SUMF, ¶ 88.)

Detective Davis created a log of the contents and had them photographed. (Defs.' SUMF, ¶ 89.)[17] This inventory included a review of, and photography of, the contents of the evidence envelopes from the prostitution stings. (Defs.' SUMF, ¶ 90, 92.) The inventory revealed that $540 was missing from the prostitution sting evidence envelopes. (Defs.' SUMF, ¶ 91.) At Detective Davis's direction, Rosen also photographed all items contained in the evidence locker and the gun safe. (Defs.' SUMF, ¶ 93.) This was the only time the evidence locker was opened during the time period at issue. (Defs.' SUMF, ¶ 95.) The photograph Rosen took of the gun safe is reproduced below. (Defs.' Ex. CC, ECF No. 108–30, at 2.)



---

[17] Plaintiff claims that "most every adjudicated prostitution file that was stored in the gun safe, migrated to the evidence locker prior to or during Robert Davis's inventory." (Pl.'s SUMF, ¶ 100.) Plaintiff only cites to his "Exhibit 27," which has never been filed with the Court and does not appear in Plaintiff's Exhibit Index. This assertion does not create a factual dispute.

After Corporal Zandarski opened the PSP investigation on October 28, 2012, Corporal Joseph Murphy (Zandarski's supervisor) handled the investigation beginning on November 1, 2012. (Defs.' SUMF, ¶ 96.) After Murphy retired in April, 2013, Zandarski again took over the investigation. (Defs.' SUMF, ¶ 97.)

During the course of the investigation, Murphy learned that DeForte arranged for multiple assault rifle and other weapons purchases through the Borough with payment made privately either by him or other part-time Borough police officers. (Defs.' SUMF, ¶ 98.)[18] DeForte also claimed to have donated expensive firearms to the Borough. (Defs.' SUMF, ¶ 99.) DeForte had told Feeney in 2011 that he wanted to start a Borough SWAT Team and wanted to purchase rifles, including Sig Sauer rifles, for the officers to complete SWAT training in Pittsburgh. (Defs.' SUMF, ¶ 100.) Feeney told Murphy he agreed to the purchase of the rifles in 2011 because it would not cost the Borough any money. (Defs.' SUMF, ¶ 102.)

Corporal Murphy spoke to representatives from Sig Sauer's Law Enforcement Sales Department, who related that Sig Sauer sold two 5.56 short barrel rifles to the Borough in late 2011. (Defs.' SUMF, ¶ 103.) DeForte had sent Sig Sauer a letter confirming the rifles were for official use and not for resale. (Defs.' SUMF, ¶ 103.) Payment was made by two money orders in 2012, and DeForte paid the balance on the rifles after the PSP investigation began. (Defs.' SUMF, ¶ 103.) Sig Sauer sold the Borough three more 5.56 short barrel rifles in May, 2012. (Defs.' SUMF, ¶ 103.) Sig Sauer advised that the Borough purchased these rifles on a "trade agreement" for two used Sig Sauer 551A1 rifles, which DeForte had purchased personally and donated to the Borough. (Defs.' SUMF, ¶ 103.) DeForte had begun efforts to transfer all three of

---

[18] Plaintiff denies this statement on the basis that he was given approval by Borough Council and Feeney to purchase personal items through the Borough. (Pl.'s Response, ¶ 98.) This assertion, whatever its validity, does not respond to whether Murphy learned of an arrangement to buy firearms through the Borough with private payment, and does not create a genuine dispute of material fact.

the new 2012 rifles to Chris Burns, owner of C&G Arms, but the transfer was terminated after the PSP began its investigation. (Defs.' SUMF, ¶ 103.)[19]

One of the 2011 rifles was found in the Borough gun safe and the other, initially thought to be missing, was found at C&G Arms. (Defs.' SUMF, ¶ 103.) Corporal Murphy interviewed numerous people, including representatives from Sig Sauer, former Worthington PD Officers, and Chris Burns, in an attempt to confirm and follow the Borough firearms purchases arranged by DeForte, as well as his efforts to donate or trade rifles. (Defs.' SUMF, ¶ 104.) Murphy and Zandarski had never seen a situation where a municipality permitted officers to purchase assault weapons through the Borough or the official Police Department account, or where a municipality purchased firearms and then gifted them to officers after a certain length of service. (Defs.' SUMF, ¶ 106.)[20] Nor had they encountered a situation where an officer donated firearms worth thousands of dollars to a police department. (Defs.' SUMF, ¶ 107.)

During the investigation, the PSP discovered that DeForte would prepare memos for Feeney to sign that purported to approve transfers of firearms to the individual officer, who would own the weapon at some point. (Defs.' SUMF, ¶ 108.) Feeney indicated that he trusted DeForte and would sign documents presented to him without knowing what he was signing. (Defs.' SUMF, ¶ 109.) Zandarski described the May 31, 2012 memo (which purported to transfer ownership of an Armalite M15 rifle from the Borough to Rodgers) as "absurd" and testified that he had "never heard of such a thing." (Defs.' SUMF, ¶ 110.)

---

[19] Plaintiff denies this statement on the basis that "all three 5.56 rifles were in the gun safe as of November 5, 2012," (Pl.'s Response, ¶ 103,) a fact that is not in dispute. That may be so, but it does not bear on whether Plaintiff had begun the process of transferring the weapons to C&G Arms.

[20] Plaintiff denies the statements about the PSP Officers' reaction to the firearms transfers on the basis that all transfers were accounted for and approved by the memo signed by Feeney. That may be the case, but it does not create a dispute as to whether *Zandarski and Murphy* thought the transactions were unusual. The Court notes, but does not need to decide here whether Plaintiff's statements in this regard would be evidence of his participation in a scheme to make and/or facilitate "straw purchases" of firearms in violation of federal firearms laws.

Zandarski also took steps to investigate a possible forgery charge in connection with Feeney's signature on the Borough documents prepared by DeForte. (Defs.' SUMF, ¶ 113.) On July 1, 2013, Zandarski sent multiple documents with Feeney's signature to the PSP Document Examination Lab in Harrisburg for analysis. (Defs.' SUMF, ¶ 114.) On November 20, 2013, the Lab concluded that the Feeney signatures were genuine. (Defs.' SUMF, ¶ 116.) Feeney contended that whether he or not he signed them, he did not approve of the memos. (Defs.' SUMF, ¶ 117.)

The PSP also investigated the two (2) portable radios found at Pine Township. (Defs.' SUMF, ¶ 119–22.) Clyde Moore from Pine Township had turned over two Kenwood Radios that did not belong to Pine Township, and Feeney identified them as belonging to Worthington Borough. (Defs.' SUMF, ¶ 120.) Pine Township documents obtained by Murphy included the October 15, 2012, email from DeForte telling the Pine Township secretary that he had obtained "two radios." (Defs.' SUMF, ¶ 122.)[21]

The PSP also investigated DeForte's transfer of an Armalite M15 to Rodgers. In 2011, DeForte sold Rodgers an MSAR – STG 5.56 rifle for $1500. (Defs.' SUMF, ¶ 123.) Rodgers paid DeForte $500 by check and the rest in cash. (Defs.' SUMF, ¶ 124.) Rodgers thought the STG 5.56 would not fire properly and asked DeForte for a different gun. (Defs.' SUMF, ¶ 125.) DeForte took the STG back from Rodgers and re-sold it to Shane Bracken, a Constable of Kittanning Township. (Defs.' SUMF, ¶ 126.) DeForte then gave Rodgers his own rifle, an Armalite M15 which had a lower assembly with serial No. US 350432 and upper assembly and scope. (Defs.' SUMF, ¶ 127.) Rodgers believed this was DeForte's personal rifle because he

---

[21] Plaintiff avers that Worthington Borough has never had Kenwood Radios, and has exclusively used Motorola radios. (Pl.'s SUMF, ¶ 66.) He cites to his Exhibit 15.l, ECF No. 124–61, which is an invoice for a purchase of radios by the Department in 2008. This Exhibit does not support Plaintiff's contention that the Department never had Kenwood Radios.

always had the rifle with him. (Defs.' SUMF, ¶ 128.) However, the PSP investigation revealed that Worthington Borough had purchased the Armalite lower assembly in 2010 with a federal grant check. In 2011, the Borough also purchased an upper receiver (which does not have a serial number) for an Armalite M15 rifle. (Defs.' SUMF, ¶ 130.)[22]

As Rodgers and the Borough officials began to inventory weapons and Borough property on October 28, 2012, Rodgers realized that the Borough's missing Armalite rifle was the same rifle DeForte had sold him. (Defs.' SUMF, ¶ 132.)[23] He turned it over to the PSP a few days later. (Defs.' SUMF, ¶ 133.) DeForte had also attempted to sell this rifle to Traister. (Defs.' SUMF, ¶ 135.) The only missing weapon that could be traced to a direct purchase by the Borough, using Borough or federal grant funds, was the Armalite rifle with lower assembly serial No. US 350432. (Defs.' SUMF, ¶ 134.)

Townsend testified that he had no knowledge as to who may have removed money from the evidence envelopes in the evidence locker. (Defs.' SUMF, ¶ 136.) He never witnessed anyone plant or falsify evidence at the Department. (Defs.' SUMF, ¶ 137.) When interviewed by Corporal Murphy, DeForte said the last time he was in the locker was when he returned money to a third party on an unrelated case, which would have been documented in the log. (Defs.' SUMF, ¶ 139.) DeForte admitted that the prostitution sting cases had pled out, and the money was to be returned to the accused, but he had not returned any of it. (Defs.' SUMF, ¶ 141.) The

---

[22] Plaintiff denies this statement on the grounds that a Worthington Borough check with number 94586 has not been produced. This check number comes from the PSP Incident Report, Defs.' Ex. G, ECF No. 115–8, at 8, and other than his own ungrounded say-so, Plaintiff has offered no evidence that this statement in the Report is factually incorrect or in dispute.

[23] Plaintiff denies this statement, saying that Rodgers "always knew" that the rifle was Borough property, but his citation to Shane Bracken's affidavit stating that Rodgers wanted a receipt showing transfer of the lower, (Pl.'s Ex. 22, ECF No. 124–95, at 2,) and Evan Townsend's affidavit stating that Feeney told DeForte to "Make sure Rodgers gets his letter," which is a hearsay statement and therefore not properly considered on summary judgment, do not establish a dispute of fact as to whether Rodgers knew the lower belonged to the Borough.

PSP discovered that the prostitution sting cases had been disposed of before the District Magistrate. (Defs.' SUMF, ¶ 147.) When Rodgers contacted some of the defendants, they confirmed the money had not been returned to them. (Defs.' SUMF, ¶ 147.)

After taking over the investigation in mid-2013, Zandarski also interviewed Officer Traister, who said that while processing the money evidence from the prostitution sting, DeForte told her to write an undetermined amount on the evidence envelope, not a breakdown of the money received (as she had been doing). (Defs.' SUMF, ¶ 143.) Traister felt uncomfortable about this idea, and entered a total without giving a breakdown of denominations. (Defs.' SUMF, ¶ 144.)[24]

Worthington Borough officials advised the PSP that DeForte was the only custodian of the evidence locker and the only person who had a key to it. (Defs.' SUMF, ¶ 148.) The PSP was also told that any money, guns, drugs, or other property seized in any incident would be exclusively kept in the evidence locker. (Defs.' SUMF, ¶ 149.)

Based on the evidence and investigation, Murphy believed there was sufficient support for charges against DeForte, including theft of Borough property. (Defs.' SUMF, ¶ 150.) Murphy met with the District Attorney ("DA") on March 15, 2013, and presented his investigation, and the DA said he would consider if there was enough evidence for charges and update the offices. (Defs.' SUMF, ¶ 151.)

Murphy recalled that during his interview with Townsend, Townsend mentioned taking photographs when he went to the police station in the wee hours of October 28, 2012. Murphy could not remember whether Townsend actually sent him copies of the photographs, but said that

---

[24] Plaintiff denies this statement, saying that "[t]he hand writing on the outside of the prostitution sting envelopes is that of the Plaintiff's and/or Townsend's," and cites to what appear to be copies of the envelopes. (Pl.'s Response, ¶ 144.) The Court is not in a position to conduct a handwriting analysis, and whether Traister or some other party wrote the amounts does not create a material factual dispute.

if he did, he did not print or keep them because they were not significant. (Defs.' SUMF, ¶ 155.) At any rate, Murphy's concern when interviewing Townsend was ensuring PSP could identify and locate all the pertinent weapons. (Defs.' SUMF, ¶ 156.) Murphy went to the Department on November 5, 2012, and was able to confirm that the rifle Townsend described was in the gun safe. (Defs.' SUMF, ¶ 157.) No one, including Townsend or DeForte, had suggested to Murphy that there was money or evidence envelopes in the gun safe (as opposed to the evidence locker).[25] (Defs.' SUMF, ¶ 160.) Looking at Townsend's gun safe photograph (reproduced above) in 2018, Murphy stated that he only noticed a relatively thin manila folder which does not appear to contain evidence envelopes or money. (Defs.' SUMF, ¶ 161.)[26]

On November 4, 2013, a Detective Belliveau from the University of Massachusetts contacted Corporal Zandarski and reported that he had arrested DeForte at the University for felony weapons violations and living in an unauthorized location on campus. (Defs.' SUMF, ¶ 162.) Belliveau reported that DeForte was interviewed and said that he was in law school and was also a police officer in Pennsylvania. (Defs.' SUMF, ¶ 163.) Zandarski advised Belliveau that the PSP was investigating DeForte regarding a forgery complaint by Worthington Borough. (Defs.' SUMF, ¶ 166.) Zandarski also learned of criminal charges that Allegheny County was pursuing against DeForte. (Defs.' SUMF, ¶ 168.)

---

[25] In his affidavit, Townsend said that he informed the PSP in early November 2012 that the adjudicated prostitution files were in an accordion folder located inside the gun safe. (Pl.'s Amended Ex. 23, ECF No. 148, at 2.) However, this affidavit conflicts with Townsend's previous sworn deposition testimony that he "couldn't even really remember" his interview with Corporal Murphy, beyond the fact that he told Murphy about the photographs he had taken and that the Borough "was a bad environment." (Pl.'s Ex. 10, ECF No. 124–23, at 28.) Townsend also confirmed that at the time of the interview, Murphy told him the focus was on "the rifles." (*Id.*) The Court will disregard Townsend's affidavit because it contradicts his earlier deposition testimony without providing a plausible explanation for the conflict. *See Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004). Plaintiff cannot create a material issue of fact on this basis.

[26] Plaintiff denies this statement because "[i]t is obvious to any objective view that the accordion folder is full of documents. The picture speaks for itself." (Pl.'s Response, ¶ 161.) The Court concludes that no reasonable factfinder could view this photograph and identify an accordion folder, let alone an accordion folder "full of documents." At any rate, Plaintiff's averment does not create a material dispute as to what *Murphy* saw when looking at the photograph.

On December 4, 2013, Zandarski, who had since transferred to the PSP Butler Barracks, met with Lieutenant Dubovi, in charge of the Kittanning Crime Unit, and the Armstrong County DA to discuss DeForte's case. (Defs.' SUMF, ¶ 170.) In particular, Zandarski told the DA that he had verbal assurance that the portable radios found at Pine Township belonged to Worthington Borough and that Borough officials were looking for proof of purchase. (Defs.' SUMF, ¶ 178.) Zandarski also discussed DeForte's May 13, 2012, memo dealing with the Armalite rifle sold to Rodgers. (Defs.' SUMF, ¶ 179.) The DA agreed that the memo was suspicious and did not make sense. (Defs.' SUMF, ¶ 180.)

Upon review of all aspects of the investigation, the DA told them which charges he approved and instructed Zandarski to file those charges. (Defs.' SUMF, ¶ 172.) Several things that Zandarski, Dubovi, and the DA discussed were not included in the criminal complaint, which was issued on January 16, 2014. (Defs.' SUMF, ¶¶ 173–74.) Feeney and Rodgers were not part of the meeting in deciding whether to bring charges against DeForte, and did not play a role in reviewing or approving the charges. (Defs.' SUMF, ¶ 181.)

The criminal complaint against DeForte asserted five (5) criminal counts: (1) Theft by Unlawful Taking (AR-15); (2) Theft by Deception (AR-15); (3) Receiving Stolen Property (AR-15); (4) Theft by Unlawful Taking (Money and Radios); and (5) Receiving Stolen Property (Money and Radios). (Defs.' SUMF, ¶ 175.) These charges concerned the alleged theft of the Armalite rifle, the two (2) portable radios found at Pine Township, and the missing prostitution sting money. (Defs.' SUMF, ¶ 177.) The Affidavit of Probable Cause was executed by Zandarski and approved by District Attorney Scott Andreassi. (Defs.' SUMF, ¶ 176.)

In formulating the charges, Zandarski relied upon Detective Davis's inventory, which she had provided to Corporal Murphy. (Defs.' SUMF, ¶ 182.) Because Murphy had not entered the

photographs taken by Townsend into evidence, Zandarski did not see the photographs. (Defs.' SUMF, ¶ 183.) Zandarski recalled that Murphy mentioned that Townsend had photos of guns in the Department's gun safe, but that Murphy thought the photos were insignificant. (Defs.' SUMF, ¶ 184.)

Zandarski also followed up on accusations that DeForte had made against others during his earlier interview with Murphy. (Defs.' SUMF, ¶ 185.) Zandarski spoke with several individuals, including the Worthington Fire Department's President, about DeForte's claim that Feeney stole radios from the Fire Department. (Defs.' SUMF, ¶ 186.) The Fire Department President, Dewey Stewart, described the claim as absurd, and said that he knew where the radios were and allowed Feeney to borrow them. (Defs.' SUMF, ¶ 187.)

On February 26, 2014, a Preliminary Hearing was held in DeForte's criminal case, and all charges were bound over for court. (Defs.' SUMF, ¶ 189.) Rodgers, Zandarski, and Detective Davis all testified at the Hearing. (Defs.' SUMF, ¶ 193.) An omnibus hearing scheduled for July 17, 2014, was continued until August 19, 2014. (Defs.' SUMF, ¶ 190.) In January of 2015, Trooper Geibel from the PSP Kittanning Barracks contacted DeForte's counsel to have DeForte come in for fingerprinting, as he had never been processed on the pending charges. (Defs.' SUMF, ¶ 191.) DeForte refused, and was never processed. (Defs.' SUMF, ¶ 192.)

In August, 2015, all criminal charges against DeForte were *nolle prossed*. (Defs.' SUMF, ¶ 194.)

### ix. Corporal Zandarski's Supplemental Employment with Rodgers's Logging Business

Corporal Zandarski had an educational background in forestry, and began performing independent contract work as a Forester for Rodgers's logging business in August or September of 2014. (Defs.' SUMF, ¶ 195.) Zandarski applied with PSP to approve this supplemental

employment in June of 2014. (Defs.' SUMF, ¶ 196.) When Zandarski began working for Rodgers's business, the investigation of DeForte had been over for six (6) to seven (7) months. (Defs.' SUMF, ¶ 197.)

B.   **Procedural History**

Plaintiff initiated this civil action at Docket Number 2:16-cv-0067 on January 14, 2016, bringing claims under 42 U.S.C. §§ 1983, 1985, 1986, 1988, and the Fourth and Fourteenth Amendments to the Constitution, as well as state law tort claims for malicious prosecution, abuse of process, and intentional infliction of emotional distress against Worthington Borough, Feeney, and Rodgers. (Complaint ("Compl."), ECF No. 1.) In separate litigation in this Court at Docket Number 2:16-cv-113, Plaintiff brought the same set of claims against Corporal Zandarski. (*See* Complaint, ECF No. 1, at Docket 2:16-cv-113.) The Court consolidated these cases on August 22, 2017. (Order of Consolidation, ECF No. 45.)

In the case against Zandarski, the Court granted in part and denied in part Zandarski's Motion to Dismiss, dismissing all of Plaintiff's federal claims against Zandarski in his official capacity, all of his individual-capacity claims against Zandarski brought under 42 U.S.C. §§ 1985 and 1986, his malicious prosecution claim, and his abuse of process claim. (Order, ECF No. 13, Docket 2:16-cv-113.) The Court denied the Motion as to Plaintiff's Fourteenth Amendment fabrication-of-evidence claim and his state tort claims for malicious prosecution and intentional infliction of emotional distress. (Opinion, ECF No. 12, at 19–21, 25–26.)

In the case against the Borough, Rodgers, and Feeney, the Court granted in part and denied in part their motions to dismiss, dismissing all of Plaintiff's claims against Worthington Borough, dismissing Plaintiff's official-capacity claims against Feeney and Rodgers, dismissing Plaintiff's individual-capacity claims against Feeney and Rodgers brought under 42 U.S.C.

§§ 1985 and 1986, dismissing his abuse-of-process claims against Feeney and Rodgers, and dismissing the state-law claims against Feeney. (Order, ECF No. 31.) The Court denied the Motion as to Plaintiff's Fourteenth Amendment fabrication-of-evidence claim against Feeney and Rodgers and his state tort claims for malicious prosecution and intentional infliction of emotional distress against Rodgers.

Defendants filed Motions for Summary Judgment (ECF Nos. 116, 117, 118) and briefs in support therein. Plaintiff filed Briefs in Opposition (ECF Nos. 127, 131, 132). Defendants filed Reply Briefs (ECF Nos. 134, 136, 138) as authorized by the Court's summary judgment scheduling order. Plaintiff filed sur-replies without leave of Court, at ECF Nos. 141, 142, and 143, in violation of the Court's Standing Order on Civil Motions Practice. Defendants filed a Joint Motion to Strike the sur-reply briefs, at ECF No. 149. That Motion will be granted, and the Court has not relied on any of the sur-reply briefing.[27] On November 26, 2018, the Court held Oral Argument on the Defendants' Motions for Summary Judgment. These motions are ripe for disposition.

## II.  STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

---

[27] The Court's review of these documents reveals that they consist of rehashes of Plaintiff's arguments, his unsubstantiated assertions of fact without record evidence, or some combination of those things. In any event, they add nothing to the analysis of the issues before the Court.

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) (quoting Fed. R. Civ. P. 56(a) & (e)). To meet its burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989). Moreover, a party's labelling or characterizing a fact as "disputed" does not make it so—the record evidence the opposing party points to must support the dispute of fact, whether through reasonable inference or otherwise. If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587; *Huston v. Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The line between reasonable inferences and impermissible speculation is often 'thin,' *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985), but nevertheless is critical because 'an inference based upon a speculation or conjecture does not create a material factual

dispute sufficient to defeat summary judgment.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990)). Any inference must follow directly from admissible evidence. *See Anderson*, 477 U.S. at 255.

It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See id.*; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004). Although summary judgment may be granted based on affidavits, conflicts of credibility should not be resolved on a motion for summary judgment unless the opponent's evidence is "too incredible to be believed by reasonable minds." *Losch v. Borough of Parkesburg.*, 736 F.2d 903, 909 (3d Cir. 1984) (quoting 6 *Moore's Fed. Prac.* ¶ 56.14(4)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *See Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex Corp.,* 477 U.S. at 323–24).

## III.    DISCUSSION

Defendants aver that they are entitled to summary judgment in their favor because they are entitled to judgment as a matter of law, and because no material issues of fact remain as to the remaining claims in Plaintiff's Complaints in the two consolidated cases (16-cv-67 and 16-cv-113): Count I, violation of the Fourteenth Amendment, against all Defendants in their individual capacities; Count II, malicious prosecution, against Rodgers and Zandarski; and Count IV, intentional infliction of emotional distress, against Rodgers and Zandarski. Plaintiff argues that summary judgment should not be granted because a number of material factual disputes

remain. For the reasons that follow, the Court will grant Defendants' Motions for Summary Judgment in their entirety.

### A.  Fabrication of Evidence

Plaintiff has alleged in Count I that Feeney and Rodgers staged a bogus theft of cash, guns, and radios in order to frame Plaintiff for the thefts and cause baseless state criminal charges to be filed against him, and that Zandarski manipulated the evidence and filed false criminal charges to cover up for Feeney and Rodgers's alleged crimes. Defendants have raised various arguments as to why summary judgment should be granted in their favor on this Count, chiefly that the claim fails on the merits, and that they are entitled to Qualified Immunity. The Court concludes that Defendants are entitled to Qualified Immunity because even though Plaintiff's Constitutional fabrication-of-evidence claim was available as of 2012, Plaintiff cannot establish that he was deprived of a protected life, liberty, or property interest. Plaintiff's failure to establish that he was deprived of life, liberty, or property also dooms his Fourteenth Amendment claim on the merits.

### i.    Qualified Immunity

The affirmative defense of qualified immunity "shield[s] officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To overcome that immunity, a plaintiff must show (1) the violation of a constitutional right and (2) that the right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court may address these two prongs in either order, depending on a given case's circumstances. *Pearson*, 555 U.S. at 236. A government official's conduct violates clearly established law when, at the time of the challenged conduct, every reasonable official would understand that her actions violated the right

alleged. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). To be clearly established, a right's contours must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it" and that "existing precedent . . . placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (quoting *al-Kidd*, 563 U.S. at 741). Moreover, "clearly established law should not be defined at a high level of generality" but must instead "be particularized to the facts of the case." *White v. Pauly*, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) (citation omitted).

But "qualified immunity applies regardless of whether the government official's conduct results from a mistake of law, mistake of fact, or mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (internal quotation marks omitted)). The doctrine is designed to "give[] government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *al-Kidd*, 131 S. Ct. at 2074). As explained below, Defendants are entitled to Qualified Immunity and to summary judgment on the merits, because even though Plaintiff's right not to be charged based on fabricated evidence was clearly established as of 2012, he cannot show that he was deprived of a constitutionally protected life, liberty, or property interest.

> *i. Whether a Claim for Fabrication of Evidence was Clearly Established in 2012*

"To be clearly established, the very action in question need not have previously been held unlawful." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 993 (3d Cir. 2014). Rather, the "contours of the right" must be sufficiently clear that the unlawfulness of the action would be

apparent in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has provided the guiding premise that "a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust consensus of cases of persuasive authority." *Id.* at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42 (internal quotation marks omitted)). "It is not enough that the rule is suggested by then-existing precedent." *Id.* at 590. "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*

Defendants contend that the right to be free from a due process violation based on fabrication of evidence was not clearly established in the fall of 2012, when the events giving rise to Plaintiff's Complaint took place. That is because the Third Circuit did not recognize a Fourteenth Amendment fabrication-of-evidence claim until April of 2014, in *Halsey v. Pfeiffer*, 750 F.3d 273 (2014). Plaintiff, in response, points to four Supreme Court cases pre-dating 2012, that he avers clearly established the right: *Brady v. Maryland*, 373 U.S. 83 (1963); *Burns v. Reed*, 500 U.S 478 (1991); *Buckley v. Fitzsimons*, 509 U.S. 259 (1993); and *United States v. Lanier*, 520 U.S. 259 (1997). The Court does not entirely agree with Plaintiff or Defendants' arguments. Instead, the Court reads *Halsey* as stating that the right to be free from prosecution based on fabricated evidence existed before 2014.

To begin, none of Plaintiff's cited cases clearly establishes a claim for fabrication of evidence. *Burns* held that a prosecuting attorney is absolutely immune from liability for § 1983 damages for participating in a probable cause hearing, but not for giving the police legal advice. 500 U.S. at 481. *Buckley* held that a prosecutor's alleged fabrication of evidence during the preliminary investigation of an unsolved crime is *shielded* by qualified immunity. 509 U.S. at

276. And *Lanier* involved an analysis of the standard for determining whether particular conduct (sexual assault of women by a state judge) falls within the ambit of criminal liability under 18 U.S.C. § 242. It does not say anything about a Fourteenth Amendment fabrication-of-evidence claim.

*Brady* comes closest to the mark. In *Brady*, the Supreme Court issued its landmark holding setting forth that the prosecution's failure to disclose favorable material evidence violates due process. 373 U.S. at 87. In fact, as discussed below, the Third Circuit in *Halsey* cited *Brady* for the proposition that a fabrication-of-evidence claim was clearly established "long before" 1985.

As Defendants note, it is indisputable that *Halsey* was decided in 2014 and *Black* in 2016. However, in *Halsey*, the Third Circuit determined that the fabrication-of-evidence claim *was* clearly established at least as of 1985, when the violation in that case occurred. 750 F.3d at 295. This recognition presents something of a space-time continuum issue for the Court. That is, if the Third Circuit recognized in 2014 that a claim predicated on fabricated evidence was clearly established "long before" the plaintiff's prosecution in 1985, when was the right actually clearly established? The Court reads *Halsey* to conclude that the right was clearly established before 2012, when the events giving rise to Plaintiff's Complaint took place. This determination accords with the Third Circuit's conclusion that "[r]easonable officers should have known [after the Supreme Court decided *Brady* in 1963] that if they could not withhold exculpatory evidence from a defendant, they certainly could not fabricate inculpatory evidence against a suspect or defendant." *Halsey*, 750 F.3d at 296.

The Court therefore concludes that a standalone claim for fabrication of evidence, arising under the Fourteenth Amendment's Due Process Clause, was available to Plaintiff in 2012.

*ii. Whether Defendants violated Plaintiff's Fourteenth Amendment rights*

Defendants next contend that even if the right was clearly established in 2012, they did not violate Plaintiff's Fourteenth Amendment rights and therefore they are entitled to judgment in their favor. Plaintiff argues that Defendants violated his rights by fabricating evidence in order to drum up criminal charges and ruin his life. The Court concludes that Plaintiff cannot establish that Defendants violated his rights.

The Third Circuit has recognized a standalone claim for fabrication of evidence, arising under the procedural due process component of the Fourteenth Amendment. *See Black v. Montgomery Cty.*, 835 F.3d 358, 369 (3d Cir. 2016); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). Such a claim stands alone because it need not be tied to a malicious prosecution claim. *Halsey*, 750 F.3d at 292.

To establish a fabrication-of-evidence claim, a plaintiff must show there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." *Black*, 835 F.3d at 372. To meet the "reasonable likelihood" standard, the plaintiff must establish a "meaningful connection" between the due process injury and the use of fabricated evidence. *Id.* The plaintiff must also establish "that the fabricated evidence 'was so significant that it could have affected the outcome of the criminal case.'" *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295). Further, there is a "notable bar" for whether evidence was fabricated. *Id.* at 372. "[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey*, 750 F.3d at 295. Instead, there must be persuasive evidence that the fabricated evidence's proponents knew the evidence was incorrect or offered it in bad faith. *Id.*

The Third Circuit in *Black* "reiterate[d] that 'we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case.'" *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295). For instance, *Halsey* presented such unusual facts that the Court said it "hardly [could] conceive of a worse miscarriage of justice." 750 F.3d at 278. The plaintiff served twenty years of a sentence of two life terms in prison for the torture and murder of his partner's two young children after investigators inserted details the plaintiff could not possibly have known into a "confession" that he signed after a relentless and coercive interrogation. *Id.* at 278–82. All the while, the real killer, known to the police to have a record of sexual assaults and who lived next door to the children, "avoided arrest despite nervously asking the investigating detectives whether he would be 'locked up.'" *Id.* at 278.

Although *Halsey*'s holding contemplated a civil litigant who had been *convicted* at a criminal trial in which the prosecution used fabricated evidence, *Black* noted that the protection recognized in *Halsey* did not turn on whether the plaintiff had been convicted at trial. *Black*, 835 F.3d at 371. In *Black*, the Court held that the plaintiff's acquittal did not preclude her fabrication-of-evidence claim, reasoning that holding otherwise "would insulate the ineffective fabricator of evidence while holding accountable only the skillful fabricator. *Id.*

Here, Defendants argue that Plaintiff cannot establish a fabrication-of-evidence claim because he does not assert a deprivation of liberty as required to state a procedural due process claim, and because no fabrication of evidence occurred. Plaintiff advances several theories of injurious deprivation of liberty and property interests, and also provides a theory of events in which Defendants fabricated evidence resulting in his criminal charges.

1. <u>Deprivation of a protected interest</u>

Plaintiff claims he was deprived of liberty and property. Defendants aver that Plaintiff cannot establish a fabrication-of-evidence claim because he does not assert a deprivation of liberty as required to state a procedural due process claim. The Court agrees that no reasonable jury could conclude that Plaintiff was deprived of a protected life, liberty, or property interest as required to state a fabrication-of-evidence claim.

The Third Circuit has not spoken directly to what injury is required to state a fabrication-of-evidence claim, perhaps because it did not need to in *Halsey* and *Black*. In those cases, the Court did not need to address whether the fabrication of evidence, in and of itself, absent an allegation of deprivation of liberty, would give rise to a cognizable injury. That is because in both *Black* and *Halsey*, the plaintiffs were manifestly deprived of their liberty. The plaintiff in *Halsey* served twenty years in prison, and the plaintiff in *Black* endured the various restraints on her liberty involved in the criminal process, including traveling from California to Pennsylvania for all pre-trial hearings, posting unsecured bail of $50,000, and living under "the cloud of very serious charges," *Black*, 835 F.3d at 367–68. Nothing like any of that happened to Plaintiff here.

In the broader procedural due process context, a claim for "[s]ubmission to a fatally biased decisionmaking process," *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 545 (3d Cir. 2017) necessarily entails as an element a deprivation of liberty or property because "[a]t the core of procedural due process jurisprudence is the right to advance notice of *significant deprivations of liberty or property* and to a meaningful opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998) (emphasis added). Put differently, the deprivation by state action of a protected interest in life liberty, or property, without due process of law, is unconstitutional. *See Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 283–84 (3d Cir. 2008).

In the fabrication-of-evidence context, the Third Circuit has yet to decide whether a plaintiff alleging such a claim must also allege that she was deprived of her life, liberty, or property in some way. However, several other Courts of Appeals have. The Second Circuit in *Zahrey v. Coffey* (cited favorably in *Black*) noted that "[l]itigants sometimes speak of a 'right to due process,' . . . . [b]ut the Constitution does not guarantee 'due process' in the abstract; it guarantees that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.'" 221 F.3d 342, 348 n.4 (2d Cir. 2000) (fourth and fifth alterations in original) (quoting U.S. Const. amend. V). And the Seventh Circuit noted that to prevail on a fabrication-of-evidence claim, "the plaintiff must have suffered a deprivation of liberty." *Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016); *cf. Weiland v. Palm Beach Sheriff's Off.*, 792 F.3d 1313, 1328 (identifying "unjust incarceration" as "a deprivation of liberty redressable under the Due Process Clause of the Fourteenth Amendment" in the malicious prosecution context). Most recently, the Ninth Circuit held that "[t]o prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

Additionally, another court in the Western District of Pennsylvania has recognized that to state a procedural due process claim for fabrication of evidence, a plaintiff must allege deprivation of liberty. *Pazicni v. Miller*, No. 17-cv-117, 2017 WL 2418688, at *7 (W.D. Pa. June 5, 2017). And in fabrication-of-evidence's mirror image context, suppression of exculpatory evidence, the Supreme Court has stated that "suppression of evidence amounts to a constitutional violation only if it deprived the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

The Court concludes, based on the consensus of other Courts of Appeals to have considered the issue, Judge Fischer's reasoning in *Pazicni*, and a commonsense understanding of the nature of the injuries that may result from fabrication of evidence, that in order to state a fabrication-of-evidence claim arising under the procedural component of the Due Process Clause of the Fourteenth Amendment, a plaintiff must allege that he was deprived of life, liberty, or property in some way as a result of the fabricated evidence. Unlike in the administrative procedural due process context, in which submitting one's claims to a biased tribunal is itself injurious, the court does "not see how the existence of a false police report, sitting in a drawer in a police station, by itself deprives a person of a right secured by the Constitution and laws," *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir. 1980); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 281 (1993) (Scalia, J., concurring) ("I am aware of[] no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution.").

The Court next turns to whether Plaintiff has advanced record evidence which would permit a jury to find a deprivation of constitutionally protected life, liberty, or property. Here, Plaintiff was never "processed" into the criminal justice system—because he refused to go to the PSP to be processed and the District Attorney did not pursue the matter—for his criminal charges before they were *nolle prossed*. Between January 16, 2014, when the charges were issued, and the *nolle prosequi* by Armstrong County on August 7, 2015, Plaintiff was never detained by police, placed into custody, or otherwise restricted in any way as a result of these charges. By contrast to the deprivations at issue in *Halsey* and *Black*, Plaintiff has not pleaded a deprivation of liberty interest, or produced evidence of such deprivation.

In the absence of an allegation that he was deprived of his liberty, Plaintiff advances two arguments: (1) that his property was seized as a result of the allegedly fabricated evidence, and (2) that his employment as a police officer was "seized" as a result of the charges, despite the fact that they were later dropped. Defendants contend that an inability to work as a police officer and loss of property do not constitute a cognizable deprivation of liberty, and even if they did, Plaintiff has not presented evidence that he was subject to either type of deprivation. Following Oral Argument, the Court asked the parties to brief whether record evidence supported an allegation of deprivation. (Pl.'s Statement, ECF No. 160; Defs.' Joint Response to Pl.'s Statement, ECF No. 161.)

First, assuming that Plaintiff had a protected property interest in continuing his employment as a public police officer, *Gilbert v. Homar*, 520 U.S. 924, 928–29 (1997); *see* Police Tenure Act, 53 Pa. Cons. Stat. § 812, Plaintiff has presented no evidence that he lost his employment as a police officer because of the Armstrong County charges. Plaintiff has shown that the North Buffalo Township Police Department *suspended* him on January 18, 2014, "as a result of [his] criminal charges by the Pennsylvania State Police [for] theft . . . *and* current criminal charges in the State of Massachusetts of weapons violations." (Pl.'s App'x A, ECF No. 160–1 (emphasis added).) The PSP filed felony charges against Plaintiff on January 16, 2014. (Pl.'s Ex. 16.d, ECF No. 124–66, at 3.) The Massachusetts charges were brought on October 24, 2013. (Pl.'s Ex. 21.b, ECF No. 124–92, at 2.) The Massachusetts felony charges for carrying a firearm without a license were dismissed on January 17, 2014, and the other Massachusetts misdemeanor charges for improper storage of firearms were dismissed on January 16, 2015. (*Id.*) This suspension does not constitute a loss of employment sufficient to deprive Plaintiff of his property or liberty. He has advanced no record evidence that he actually lost a day of work that

he would have otherwise had but for this rather amorphous "suspension." Nor, for that matter, can Plaintiff establish that but for the Armstrong County charges he would not have been suspended, because the suspension letter also expressly relied on the Massachusetts criminal charges.

Additionally, in a January, 5, 2016, memorandum regarding Plaintiff's suspension, the Chairperson of the Board of Supervisors of North Buffalo Township communicated to Plaintiff that the suspension was removed from his record, that the Township did not intend to refer to the suspension for any purpose in the future, and confirmed that Plaintiff actually kept working as a North Buffalo Police Officer: "*I know that you have worked as a police officer of North Buffalo Township since this suspension has occurred* so accept this letter to give closure to this matter." (Pl.'s App'x A, ECF No. 160–1, at 5–6 (emphasis added).)

Next, Plaintiff argues that he was deprived of his liberty because his Municipal Police Officers' Education and Training Commission ("MPOETC") certification was "seized," so he could no longer work as a police officer. On January 23, 2014, the North Buffalo Township Police Department sent a fax to the Commonwealth's MPOETC, indicating that Plaintiff had criminal arrests for theft and unsecured weapons, and that the arresting departments were the Pennsylvania State Police and the University of Massachusetts Police. (Pl.'s App'x A, ECF No. 160–1, at 3–4.)

Plaintiff has also admitted, however, that the MPOETC never wrote to him or advised him that his certification was revoked. (Pl.'s Ex. 13.1, ECF No. 124–27, at 29.) Rather, he stated (without evidentiary foundation) that his understanding was that the "MPOETC doesn't have to revoke [my certification]. The law itself revokes it. The moment you file charges I can't work.

That's a seizure." (*Id.*) He went on to confirm that the "MPOETC never called me up and took the card, but the law requires that I cannot work. . . . . In my mind that is a seizure." (*Id.*)

But in separate litigation in the Western District of Pennsylvania, in which Plaintiff was represented by the same counsel as the instant case, Plaintiff submitted a certification from the MPOETC effective from May 23, 2013 until June 30, 2015. *See* Third Amended Complaint, *Bracken, DeForte and Jennings v. Cty. of Allegheny et al.*, No. 2:16-cv-00171-CRE, ECF No. 64–2.[28] An affidavit submitted in that litigation by a Deputy Agency Open Records Officer of the Pennsylvania State Police Department Headquarters stated that Plaintiff was certified by the MPOETC and was employed by the North Buffalo Police Department from April 9, 2012, until at least the date the affidavit was issued, March 8, 2017. *Bracken v. Cty. of Allegheny*, No. 2:16-cv-00171-CRE, ECF No. 75–7.[29] Thus, the record indisputably demonstrates that no matter what Plaintiff may have assumed, there is no basis to conclude that the charges in this case ever actually impaired his MPOETC certification.

It is plain that Plaintiff was never fired as a result of any of the Pennsylvania or Massachusetts charges, and that he was employed by North Buffalo until his voluntary resignation on October 27, 2017, (*see* Defs.' Ex. A, ECF No. 161–1, at 2.) It is also apparent that even if Plaintiff subjectively felt that his certification was "seized" as a result of the charges, the MPOETC never informed him as such or revoked his certification, and the documents he has referenced demonstrate that it remained in force. Indeed, Plaintiff was continuously employed

---

[28] A panel of the Third Circuit Court of Appeals recently noted, in another of DeForte's cases, that this document "appears to certify that DeForte was employed by the North Buffalo Township Police Department from May 23, 2013 through June 30, 2015. *See Bracken v. Cty. of Allegheny*, No. 18-1101, 2019 WL 169125, at *2 n.4 (3d Cir. Jan. 11, 2019).

[29] In addition, in yet another case filed in this Court, *DeForte v. Blocker*, No. 2:16-cv-00113, in which DeForte was represented by the same counsel as the instant case, and which has since been consolidated with this case, DeForte alleged that he was employed by North Buffalo Township in 2013 and was still employed when the Complaint was filed. *See DeForte v. Blocker*, No. 2:16-cv-00113, ECF No. 1, at ¶¶ 159–60; 180–86.

during the period his charges were pending. That his certification, in theory, may have been in jeopardy may have caused Plaintiff, who by all accounts takes his status as a law enforcement officer quite seriously, some degree of stress. But even if he subjectively believed that his certification *was* "seized," and he therefore could not work, he never acted on that subjective impression by resigning, nor has he advanced evidence that there was a loss of certification that kept him from working. And North Buffalo's fax to the MPOETC could not by itself deprive him of the ability "to engage in any of the common occupations of life" or "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Second, Plaintiff avers a deprivation of a property interest in personal items that he claims Feeney, Rodgers, and Zandarski took from him while seeking to have Plaintiff criminally charged. (Plaintiff's Statement, ECF No. 160, at 2.) As a preliminary matter, the Court notes that Plaintiff has not submitted any record evidence that he requested the return of any property after the charges were dropped.

Plaintiff claims Feeney seized Plaintiff's "personal property" and displayed these items to the Borough Council. However, Plaintiff's citations to the record refer to items recovered from Pine Township that had been "labeled Worthington Borough Police Department." (Pl.'s Ex. 2.2, ECF No. 26 ("Omnibus Hearing Tr."), at 29:16.) Nowhere does the record state that these items belonged to Plaintiff.

Plaintiff also cites to his deposition in another case that "gun cleaning stuff," "bullet-making stuff," "clothing," "a clock," and "furniture" were never returned to him, (*see* Pl.'s Ex. 6.1, ECF No. 124–15, at 41–42.) Regardless of whether this statement would be admissible and can therefore be considered for summary judgment purposes, *see Pamintuan v. Nanticoke*

*Memorial Hosp.*, 192 F.3d 378, 387 & n.13 (3d Cir. 1999), Plaintiff confirmed in his same testimony that "[t]he stuff I legally could take I took, and the stuff that I legally could not take I left" when he left the station after being fired. (*Id.* at 42.) Having affirmatively stated that he had no legal claim to any property he left at the station, his statement does not support an allegation that he was deprived of property, and certainly does not create a genuine issue of fact that he was.

Nor does Plaintiff's citation to a memo from the Department stating that any officer donating or benefiting from equipment donated to the Department shall have the opportunity to possess the item after separation from the Department establish that Plaintiff actually owned any of these items in the first instance. (*See* Pl.'s Ex. 15.a, ECF No. 124–50, at 2.) "Opportunity to possess" does not mean "own."

Regarding the circumstances in which certain property was recovered from Pine Township, Borough Secretary David Conoran further explained in his deposition in another case that "we were told that they belonged to Worthington Borough and they had been taken from the Borough building and moved to Pine Township." (Pl.'s Ex. 4, ECF No. 124–12, at 39.) He then confirmed that he did not, at any time, learn that the property was owned by anyone else. (*Id.* at 39–40.) Plaintiff has advanced no evidence that calls any of that into question.

Plaintiff also claims Zandarski seized Plaintiff's Colt bayonet and a Sig Swat 556 patrol rifle (the latter of which was actually seized from C&G Arms). He avers that a canceled check shows he paid for the bayonet, and that the Borough authorized the transfer of the rifle. The record shows that a Colt bayonet with a black case, recovered from Pine Township by Clyde Moore, was marked into evidence by the PSP. (Pl.'s Ex. 16.e, ECF No. 124–67, at 3.) The PSP Property Record Form does not state ownership by him. Nor has Plaintiff provided any evidence

of ownership. The Affidavit of Probable Cause stated that "the bayonet knife was claimed by DeForte as his personal knife. He could not produce a receipt for said knife." (Pl.'s Ex. 16.b, ECF No. 124–64, at 2.) Plaintiff avers that a canceled check shows proof of ownership, but the cited canceled check from Plaintiff's account states in the memorandum line "Police equip" and does not refer to a bayonet. (Pl.'s Ex. 20.f, ECF No. 124–90, at 2,) so that canceled check is meaningless.

As to the rifle, Plaintiff has not provided any evidence of ownership by him. He cites to another Department memo signed by Feeney stating, in total, that "[t]he SIG SWAT 556 patrol rifle bearing the serial number JT021401 shall be sold to C&G ARMS in exchange for a M-4/MARK 18 style weapon of Chief DeForte's choosing. Said chosen weapon will be used by Chief DeForte in the performance of his duties and may be transferred upon legal means to Chief William DeForte." (Pl.'s Ex. 15.c, ECF No. 124–52, at 2.) If anything, this document indicates that the Sig Swat 556 rifle was to be sold to C&G Arms, not that it belonged to Plaintiff.

Third, Plaintiff avers that Rodgers is in possession of Plaintiff's upper rifle and scope assembly and "other items of Plaintiff's property." (ECF No. 160, at 3.) As to the rifle, while Rodgers admits that he is currently in possession of the rifle, Plaintiff has not established that Plaintiff owned the upper and scope assembly. Moreover, Plaintiff admits that the rifle was given to Rodgers as a trade for the first gun Rodgers had paid him for. (*See, e.g.*, DeForte Dep., Pl.'s Ex. 13.2, ECF No. 124–28, at 26; DeForte Dep., Defs.' Ex. A, ECF No. 108–2, at 254 ("I purchased this rifle and then gave it to Jerry [Rodgers] . . . . So Jerry had legal ownership of it [the first gun] at that time.") Plaintiff further admits that he never returned any money to Rodgers for the first gun, but he "did agree to trade him the 556 for the AR." (Pl.'s Ex. 13.3, ECF No.

124–29, at 33–34.) Once again, none of this is evidence that Plaintiff had an ownership interest in these items at the relevant time.

As to the "other items," Plaintiff's record citation is to Rodgers's testimony at the state court preliminary hearing that Rodgers purchased items with his (Rodgers's) own money and/or chipped in money for items "for the station" at Plaintiff's request. The exchange in the testimony is as follows:

> Q: What item did you purchase for Mr. [DeForte]?
> A: Many items: gun reloaders, colored TV, gas grills, anything he asked me.
> Q: I don't understand. You purchased him a colored television?
> A: I did. For the station.
> Q: For the station?
> A: Right.

(Pl.'s Ex. 1.2, ECF No. 124–2, at 3.) This testimony establishes that Rodgers bought various items for the station with his own money or contributions from other officers. (*See id.* ("I just gave Mr. [DeForte] the money for the TV – my share of the money on that particular thing.").) It does not establish that Plaintiff owned any of the property that *Rodgers* purchased for the station.

The Court concludes that, even viewed in the light most favorable to Plaintiff, the record evidence does not show that Plaintiff has been deprived of a constitutionally protected liberty or property interest as a result of the charges. The Court therefore need not reach a conclusion as to whether Defendants fabricated any evidence. Defendants are entitled both to Qualified Immunity and judgment on the merits on this federal claim, and the Court will grant summary judgment in their favor on Count I.[30]

---

[30] Plaintiff's Section 1988 claims for attorney fees are also dismissed, because only prevailing parties are to be awarded attorney's fees under this statute. *See* 42 U.S.C. § 1988.

## B. State Tort Claims – Zandarski

In the Complaint at No. 16-cv-113 (consolidated with this case), Plaintiff also alleges in Counts II and IV, respectively, state law malicious prosecution and intentional infliction of emotion distress claims against Defendant Zandarski.[31]

Zandarski asserts that these claims are barred by the Commonwealth's sovereign immunity. The sovereign immunity doctrine protects "the Commonwealth, and its officials and employees acting within the scope of their duties . . . from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. § 2310. Pennsylvania state law provides a limited waiver of sovereign immunity for certain negligent acts not at issue here. *See* 42 Pa. Cons. Stat. § 8522(b).

Sovereign immunity's protection, barring suit against state employees whenever they act within the scope of their official duties, applies regardless of whether Commonwealth employees are sued in their official or individual capacities. *See Zanetti v. Goss*, No. 16-cv-379, 2016 WL 6583727, at *5 (W.D. Pa. Nov. 4, 2016). The doctrine protects Commonwealth employees even with regard to intentional tort claims. *Kull v. Guisse*, 81 A.3d 148, 157 (Pa. Commw. Ct. 2013). Thus, whether immunity attaches depends on whether Zandarski was acting within his duties as a state trooper when he allegedly committed the complained-of acts. *See Mohammed v. John Doe Pa. State Police Sup'rs*, No. 11-cv-5004, 2013 WL 5741788, at *11 (E.D. Pa. Oct. 23, 2013).

To determine whether the conduct is within the scope of an employee's duties, courts consider whether "(a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits[; and] (c) it is actuated, at least in part, by a purpose to serve the [the employer]." *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (quoting *Rest. 2d. Agency* § 228). Where a state trooper is on duty and investigating a

---

[31] As noted, the remainder of Plaintiff's claims against Zandarski were already dismissed.

crime throughout the duration of the alleged offenses, she is acting within the scope of her employment and sovereign immunity will require the dismissal of state law claims against her. *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 683 (M.D. Pa. 2010).

At the Motion to Dismiss phase, Plaintiff argued that Zandarski was not entitled to sovereign immunity because he held supplementary employment in Defendant Rodgers's logging business and that, in allegedly initiating false criminal charges against him and manipulating the evidence to support those charges, Zandarski acted to curry favor with Rodgers. *See DeForte v. Blocker*, No. 2:16-cv-113, 2017 WL 1102655, at *7 (W.D. Pa. March 24, 2017). Now, Zandarski has conclusively established that he was not employed by Rodgers when the case was investigated or when, with the District Attorney's authorization, he filed the charges in January 2014 and his involvement with the matter ended.

In opposition to summary judgment, Plaintiff appears to have abandoned this argument, instead citing to cases on *qualified* immunity and stating that "while, under normal circumstances, and acting professionally, police officers would be entitled to Sovereign Immunity, however, when the record evidence in its totality is viewed in favor of the plaintiff, is undeniable that Sovereign Immunity does not apply in the case at hand." (Pl.'s Br. in Opp., ECF No. 129, at 22–23.) This conclusory statement, supported by no legal analysis on sovereign immunity, taken together with Plaintiff's citations to an inapplicable legal doctrine, and the complete absence of record evidence to support an allegation that Zandarski was not acting within the scope of his duties when he pursued charges against Plaintiff, are insufficient to divest Zandarski of sovereign immunity. The state tort claims against Zandarski will therefore be dismissed.

### C. State Tort Claims – Rodgers

#### i. Malicious Prosecution

In Count II, Plaintiff alleges a state law malicious prosecution claim against Defendant Rodgers. (Compl. ¶¶ 186–93.) Plaintiff alleges that Rodgers maliciously influenced the PSP and Armstrong County DA's office into bringing criminal charges without probable cause. (*Id.*)

 "Malicious prosecution is an action which runs counter to obvious policies of the law in favor of encouraging proceedings against those who are apparently guilty . . . . It never has been regarded with any favor by the courts, and it is hedged with restrictions which make it very difficult to maintain." *Corrigan v. Cent. Tax Bureau of Pa., Inc.*, 828 A.2d 502, 506 (Pa. Commw. Ct. 2003) (quoting *Miller v. Pa. RR Co.*, 89 A.2d 809, 810 (Pa. 1952)). "If this were not so, it would deter men from approaching the courts of justice for relief." *Id.* To prevail on a claim of malicious prosecution, a plaintiff must show that the defendant instituted proceedings without probable cause, with malice, and that the proceedings terminated in his favor. *De Salle v. Penn Cent. Transp. Co.*, 398 A.2d 680 (Pa. Super. 1979).

Here, it is undisputed that the proceedings terminated in Plaintiff's favor, as the prosecution invoked *nolle prosequi* as to all charges. The Court must therefore determine whether the record could support a conclusion that Rodgers instituted proceedings without probable cause, and with malice. The Court concludes that no facts support a conclusion Rodgers instituted the proceedings against Plaintiff, and Rodgers is entitled to summary judgment in his favor.

As a threshold matter, Plaintiff's claim is against Rodgers and not the District Attorney. Some courts have treated whether a defendant is the prosecutor as dispositive of a malicious prosecution claim. *See, e.g.*, *Gatter v. Zappile*, 67 F. Supp. 2d 515, 520–21 (E.D. Pa. 1999)

("[Plaintiff] cannot show that [Defendants] initiated the proceedings against him . . . ."). That is because the prosecutor, and not some other party, is responsible for initiating a proceeding against a criminal defendant. Rodgers argues that on this basis alone, he is entitled to summary judgment.

However, the Court has identified instances in which Pennsylvania courts permitted malicious prosecution actions to proceed against defendants who were not prosecutors (or even police officers). *See, e.g.*, *Cosmas v. Bloomingdales Bros., Inc.* (660 A.2d 83) (Pa. Super. Ct. 1995); *Wainauskis v. Howard Johnson Co.*, 488 A.2d 1117 (Pa. Super. Ct. 1985). Moreover, the Third Circuit recognized, in a case against a School District and a police department and detective, that a school district could be "liable for its major role in a malicious prosecution." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 794 (3d Cir. 2000). However, in these cases, all involving allegations of theft from the defendants (who were not prosecutors or police officers), the prosecutors acted only on information provided to them by the defendants. *See Merkle*, 211 F.3d at 794 ("Hahn acted only on what Principal Thomas told him.").

The Restatement (Second) of Torts, section 653, comment c, states that for purposes of a malicious prosecution claim, criminal proceedings are initiated "by making a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused." *Rest. 2d. of Torts* § 653. Therefore, "one who procures a third person to institute criminal proceedings against another is liable just as if he himself had initiated the proceedings." *Hess v. Lancaster Cty.*, 514 A. 2d 681, 683 (Pa. Commw. Ct. 1986).

The Restatement's operative question is whether the public official bringing charges had the discretion to do so. Thus, the Court must determine (1) whether it was left to the officer's

discretion to initiate the proceedings, in which case giving information was not a "procurement of the proceedings"; or (2) in the case that the private individual gave false information, such that "an intelligent exercise of the officer's discretion becomes impossible," whether the private person's "desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution" or the official knew the information was false. *Id.* at 683 (quoting *Rest. 2d Torts*, § 653 cmt. g).

Here, it is not disputed that the PSP and District Attorney's office held two meetings to consider whether there was enough evidence to press charges against Plaintiff. At the first meeting, Corporal Murphy, the District Attorney, Robin Davis, Station Commander Lt. Dubovi, and Zandarski attended. Zandarski, Dubovi, and the District Attorney attended the second meeting, at which the District Attorney decided which charges to approve and which to deny. Rodgers did not attend either meeting. The public officials therefore had the sole discretion to charge Plaintiff or not, and Rodgers was not in the room for that decisionmaking process.

To the extent that Plaintiff's claim is premised on the theory that Rodgers knowingly made omissions or false statements to PSP officials, even if the Court assumes that he did so, the allegedly false information or omissions were not, as a matter of law, the determining factor in the officials' decision, such that Rodgers's actions would make the officers' exercise of discretion "impossible" under the Restatement's view.

The PSP's affidavit of probable cause, prepared by Defendant Zandarski (Defs.' Ex. R ("Criminal Complaint") ECF No. 115–19, at 7–8), contains information provided by Rodgers as to his participation in the firearms transfers. Plaintiff identifies three areas in which he contends Rodgers made false statements or omissions to the PSP:

> (1) "Rodgers stated that he did not know about the rifle being issued to him.
> However, Defendant Rodgers clearly had the letter of the transfer and

issuance from Defendant Feeney in his possession and admitted such to the PSP. . . . It was inconceivable that Defendant Rodgers, a sworn officer of the law, did not know what the document he was handed specified."

(2) "Defendant Rodgers falsely stated . . . that he was under the impression that the Armalite rif[l]e was Plaintiff's personal property and not that of the Police Department."

(3) "Rodgers told the State Police that he had asked for a receipt of the sale and transfer from Plaintiff but he never received it."

(Pl.'s Br. in Opp., ECF No. 128, at 11–12.) Also, the affidavit reflects that the Rodgers (and Feeney) told the PSP that Plaintiff had the only key to the evidence locker, and Rodgers assisted Detective Davis with the inventory of the prostitution sting files showing that $540 was missing.

Yet even if Plaintiff had established that any of information Rodgers gave was false, the Court concludes that there was more than enough other evidence to establish probable cause to charge Plaintiff, and no reasonable jury could conclude otherwise.

Although this is a state-law malicious prosecution claim, the Court will assess the affidavit using the *Dempsey* reconstructive method blessed by the Third Circuit in the analogous context of § 1983 cases where probable cause is challenged. There, the Third Circuit warned that "in reviewing probable cause determinations made by law enforcement, the role of the courts is not that of the much-maligned 'Monday morning quarterback' whose critiques are made possible only by the benefits of hindsight." *Dempsey v. Bucknell Univ.*, 634 F.3d 457, 469 (3d Cir. 2016). For Plaintiff's claim to survive, a reasonable factfinder would have to be able to determine that but for Rodgers' allegedly improper omissions and misrepresentations to the PSP, there would not have been probable cause for the charges against Plaintiff. *Id.*

At the outset, the Court notes that the Court is analyzing only whether *Rodgers's* actions improperly tied the hands of the PSP and the DA here, such that they lacked the discretion to institute charges against Plaintiff. The Court is not conducting a wholesale inquiry into the PSP's

probable cause determination, and is not wading into the merits of Plaintiff's other allegations that the PSP lacked probable cause because of other parties' alleged misstatements or omissions, or because the PSP recklessly ignored evidence such as his photographs. Those allegations, which Plaintiff repeats at length in his briefing, are not relevant to his remaining malicious prosecution claim, which is only against Rodgers for his alleged role in the prosecution.

The probable cause analysis looks to, first, whether Rodgers, "with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant, and second, whether those assertions or omissions were material, or necessary, to the finding of probable cause." *Id.* at 467 (internal quotation marks omitted). For purposes of resolving this issue, the Court will assume that Rodgers did make false statements or omissions to the PSP.

The next step of the analysis is "to reconstruct the affidavit, including the recklessly omitted information, so that [the Court] may proceed with a materiality analysis." *Id.* at 474. The Affidavit, reconstructed to include the allegedly recklessly omitted information and remove the alleged misrepresentations, would read:

> On October 28, 2012, Mayor Kevin Feeney of Worthington Borough contacted the State Police to advise that he suspected [suspicious] activity by Chief William DeForte. Feeney advised that DeForte had just been released of his duties for conduct unbecoming a police officer. Worthington Borough requested that the State Police assist them in conducting a thorough inventory of their police equipment. Mayor Feeney advised that he believed to have several items missing from the police department. Mayor Feeney was informed that the State Police would not assist in the inventory of police equipment. The borough was informed to contact the Armstrong County District Attorney's office.
>
> On November 28th, 2012, an inventory was conducted by Armstrong County Detective Robin Davis and current police chief Gerald V. Rodgers Jr. This inventory uncovered that $540.00 was missing from the evidence locker. This money was recovered as evidence from a "Prostitution Sting Operation" that DeForte had conducted within Worthington Borough. The total money recovered which is documented in the from this sting operation was $1520.00. The total

amount of money in the evidence locker during the inventory from this sting operation was $980.00. Mayor Feeney and Chief Rodgers advised that DeForte was the only one with a key to the evidence locker.

On April 28th 2010, Worthington Borough purchased an Armalite M15 rifle lower half assembly bearing serial number US350432 with federal grant money. This particular rifle was then assembled with an upper receiver, Trijicon scope, and a sling. DeForte admitted to purchasing the Trijicon scope and putting it on the rifle. This particular rifle was carried by DeForte and known to others as DeForte's personal weapon.

In 2011, DeForte sold Rodgers a STG 5.56 rifle for $1500.00, Rodgers attempted to fire the weapon but it malfunctioned. Rodgers then told DeForte he wanted a weapon that functioned properly. This is when DeForte then gave the Armalite M15 rifle bearing serial number US350432 to Rodgers. DeForte told Rodgers that he could have his rifle since the other one was not functioning properly. **Rodgers had in his possession a memorandum, signed by Mayor Feeney and DeForte, stating that upon separation from the Department and/or serving for one year, the rifle would be Rodgers' personal property if Rodgers so chose. Rodgers knew that the lower was Borough property.**

On October 22 2012, DeForte was hired as the Pine Township Police Chief. While in the process of being hired, DeForte asked Pine Township secretary Stephanie Reedy if he could give $1,000.00 monthly donations to the township for purchase of guns for the police department. Reedy thought this was very suspicious. Shortly after DeForte was hired, Pine Township found out about the investigation by the State Police in Worthington. At this time, Pine Township disbanded the Pine Township Police Department.

On October 31st, 2012, Pine Township Supervisor Clyde Moore had been made aware of the State Police investigation of DeForte. At this time, Moore reported that DeForte had brought to Pine Township 15 rifle magazines and approximately 5 boxes of ammunition. He also saw two speed timing devices with Pine Township etched into the bottom. Moore said that they had agreed to purchase a police cruiser from Worthington Borough. DeForte had told Moore that along with the police cruiser they would receive police radios. Moore then contacted Mayor Feeney from Worthington Borough. Mayor Feeney advised that he had never given DeForte permission to sale police radios or any other police equipment from Worthington Borough to Pine Township. Feeney said that he was only aware of [the] police cruiser.

On November 1st, 2012, Clyde Moore brought a colt bayonet knife in a black ease along with two Robic SC-848W stopwatches to the PSP Kittanning barracks. The bayonet knife was claimed by DeForte as his personal knife. He could not produce a receipt for said knife. The two Robic stopwatches, had a total value of $119.90. Neither Pine Township nor Worthington Borough authorized the

purchase of said items. These items were logged into the PSP Kittanning evidence locker.

According to YIS/COWDEN, retailer of stopwatches, the two stopwatches in question were paid for by an unknown source in March of 2013.

On November 2nd 2012, Clyde Moore brought two Kenwood brand portable radios with charge[r]s valued at $1150.00 to the PSP Kittanning barracks. These items were logged into the PSP Kittanning evidence locker. The Kenwood brand portable radios were the property of Worthington Borough.

Next, the Court must determine "whether the recklessly omitted statements [and corrected misstatements], considered in the context of the affidavit as a whole, were omissions 'material, or necessary, to the finding of probable cause.'" *Dempsey*, 834 F.3d at 477 (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)). In order to grant summary judgment to Rodgers, the Court must conclude that no reasonable jury could find facts that would lead to the conclusion that the reconstructed Affidavit lacked probable cause.

The criminal complaint against DeForte asserted five (5) criminal counts: (1) Theft by Unlawful Taking (AR-15); (2) Theft by Deception (AR-15); (3) Receiving Stolen Property (AR-15); (4) Theft by Unlawful Taking (Money and Radios); and (5) Receiving Stolen Property (Money and Radios).

(1) Theft by Unlawful Taking (AR-15)

With respect to Theft by Unlawful Taking of the Armalite M15, state law provides that "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa. Cons. Stat. Ann. § 3921. Here, the reconstructed Affidavit sets forth that Plaintiff sold Rodgers a STG 5.56 rifle for $1,500.00, and when the gun did not work properly in Rodgers's estimation, Plaintiff swapped out the STG 5.56 for an Armalite M15 with serial number US 350432, and told Rodgers he could have it. The Armalite M15 was Borough property, carried by Plaintiff and known to others as his personal

weapon. The reconstructed Affidavit says that Rodgers knew the lower assembly was Borough property and had a document purporting to transfer that property to him after separation from the Borough and/or one year of service.

The probable cause for charging Plaintiff was not based on whether *Rodgers* knew that he was purchasing stolen property. *Plaintiff* was still the one charged with illegally transferring the weapon to Rodgers by first selling him one gun, then swapping out that gun for Borough property. Whether Rodgers knew it was Borough Property, or whether Plaintiff should have also been charged with a crime has nothing to do with the PSP's basis for charging Plaintiff.

(2) Theft by Deception (AR-15)

Pennsylvania law criminalizes "intentionally obtain[ing] or withhold[ing] property of another by deception." 18 Pa. Cons. Ann § 3922(a). "A person deceives if he intentionally":

> (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
> (2) prevents another from acquiring information which would affect his judgment of a transaction; or
> (3) fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

*Id.*

The Criminal Complaint describes the acts associated with this offense: as "The Defendant intentionally obtained or withheld property, namely, $1500, belonging to Gerald V. Rodgers Jr, by creating or reinforcing a false impression, namely that an Armalite M15 rifle bearing serial number US 350432 was his personal weapon." (Criminal Complaint, at 4.) The reconstructed Affidavit states that the Borough purchased the lower assembly for the M15, that DeForte carried the M15, that it was known to others to be his personal weapon, and that in trade

for a weapon that Rodgers paid $1500 for, DeForte gave him the M15. Whether Rodgers knew or believed that the *lower* was Borough property does not alter that DeForte gave him the entire assembled weapon in trade for $1500 worth of property. Also, the PSP had good reason to disregard the "transfer memorandum," regardless of whether Rodgers believed it was legitimate. That is, the PSP could have concluded that the memo failed to correct Rodgers' false impression that Plaintiff could have legally transferred him any portion of the gun. Therefore, even if the Court assumes that Rodgers knew the Borough owned the lower assembly, the PSP still had probable cause to charge Plaintiff with theft by deception as to the entire rifle.

(3) Receiving Stolen Property (AR-15)

Pennsylvania law provides that "A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." 18 Pa. Cons. Stat. § 3925(a). The Criminal Complaint refers to the Armalite M15 lower assembly belonging to Worthington Borough, stating that Plaintiff "did intentionally receive, retain or dispose of" the lower "with no intent to restore it to the owner, knowing that such property was stolen, or believing that it had probably been stolen." (Criminal Complaint, at 4.)

The reconstructed Affidavit reflects that DeForte gave—as part of the assembled weapon—the lower of the Armalite M15 to Rodgers in trade for a weapon Rodgers had paid Plaintiff $1500.00 for. The Affidavit also provides that the lower was purchased by Worthington Borough with federal grant money. Whether Rodgers had a memo purporting to transfer the rifle to him does not force a conclusion that the PSP did not have probable cause to charge Plaintiff

with receiving stolen property by trading the Borough-owned lower for value. If anything, the "transfer memorandum" adds to the suspicious nature of the transaction.

(4) <u>Theft by Unlawful Taking (Money and Radios)</u>

As set out above, "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa. Cons. Stat. Ann. § 3921. The Complaint charged Plaintiff with theft of two Kenwood handheld radios with chargers, valued at $1150, and the $540 missing from the evidence locker.

As to the radios, the reconstructed Affidavit does not mention Rodgers or any statements by Rodgers in connection to the investigation of the radios. The Affidavit reflects that Plaintiff told Moore that Pine Township would receive police radios, and that Feeney said he had never given permission for Worthington to sell those radios. Moore then recovered two Kenwood radios, which were property of Worthington, and brought them to the PSP Barracks. This evidence gave the State Police probable cause to charge Plaintiff with theft of the radios. Rodgers's statements or omissions had no effect on the probable-cause determination supporting this charge.

As to the theft of the money, the reconstructed Affidavit shows that Detective Davis conducted an inventory and money from an operation run by Plaintiff was missing from an evidence locker to which Plaintiff had the only key. Even if Rodgers' statement about the key is removed, Feeney's statement remains. Thus, multiple individuals other than Rodgers gave the PSP information in support of probable cause to charge Plaintiff with stealing the money.

(5) <u>Receiving Stolen Property (Radios and Cash)</u>

As set forth above, "[a] person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has

probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner." 18 Pa. Cons. Stat. § 3925(a). The reconstructed Affidavit shows that Plaintiff did not have permission to sell or donate any radios to Pine Township, and yet radios belonging to Worthington Borough turned up at Pine Township. No statement or omission by Rodgers affects that portion of the affidavit.

As to the prostitution sting money, again, the reconstructed Affidavit reflects that the PSP was told by individuals other than Rodgers that $540 was missing from a sting directed by Plaintiff, and that Plaintiff had the only key to the evidence locker. The PSP therefore had probable cause, beyond any omissions or falsehoods from Rodgers, to charge Plaintiff with intentionally receiving, retaining, or disposing of movable property of another.

Considering the reconstructed Affidavit, PSP plainly had the full discretion, as contemplated by the Restatement, to charge Plaintiff. Even assuming that Rodgers omitted facts or lied to the investigators, he was not in the room when charging decisions were made, and his alleged falsehoods and omissions did not affect the probable-cause value of the total mix of information in the reconstructed Affidavit. Plaintiff therefore cannot establish that Rodgers, by virtue of providing the PSP with information related to Plaintiff's alleged criminal acts, instituted criminal proceedings against him. No reasonable jury could find otherwise, and the Court will award summary judgment in his favor on the malicious prosecution claim.

### ii. Intentional Infliction of Emotional Distress

"The gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor." *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987). To prevail on a claim for intentional infliction of emotional distress in Pennsylvania, a claimant must prove the existence of the alleged distress by "competent medical

evidence." *Id.* at 992. The Third Circuit has interpreted this requirement to mean that "expert medical evidence" must be presented. *Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 35 (3d Cir. 1994). Plaintiff avers that he sought treatment for "severe headaches brought by the stress caused from" Rodgers' actions. (Pl.'s Br. in Opp., ECF No. 128, at 20.) Plaintiff cites to his Exhibit 25, showing a blurred reproduction of what appears to be a note from a Registered Nurse at Dartmouth Medical Center stating that the Plaintiff was examined on October 24, 2013, and given medication for migraines to be used as needed. (Pl.'s Ex. 25, ECF No. 124–98, at 2.)

This is not expert medical evidence. Moreover, considering the timing of this medical visit, approximately one year after he was fired from Worthington Borough while he was in law school and dealing with the events that led to his expulsion, as well as pending criminal charges in Allegheny County, and absent any further medical evidence that his ailment was linked to the events alleged in the Complaint, the Court concludes that Plaintiff has provided insufficient competent medical evidence to support his pleadings. He therefore cannot establish the elements of intentional infliction of emotional distress, and summary judgment will be granted in Rodgers's favor on this Count.

## IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motions for Summary Judgment, at ECF Nos. 109 (errata 115), 111, and 113, will be granted. Defendants' Joint Motion to Strike at ECF No. 149 will be granted. Defendants' Joint Motion to Strike at ECF No. 151 will be denied.

An appropriate Order will follow.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  March 4, 2019

cc:      All counsel of record